IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

CASE NO. 22-13669-HH

_____

MARIA EUGENIA BLANCO, and all others similarly situated under 29
U.S.C. § 216(b)
Appellant/Employee

v.

ANAND ADRIAN SAMUEL and LINDSEY ADAMS FINCH
Appellees/Employers

_____

APPELLANT'S INITIAL BRIEF

J.H. ZIDELL, ESQ.
J.H. ZIDELL P.A.
Attorney For Appellant/Employee
300 Seventy-First Street, Suite 605
Miami Beach, Florida 33141
Telephone (305) 865-6766
Facsimile: (305) 865-7167
Fla Bar No. 0010121

## CERTIFICATE OF INTERESTED PERSONS

1. Beutler, Mark J.  (Appellees' Counsel/ Employers' Counsel)

2. Blanco, Maria Eugenia (Appellant/ Employee)

3. Brand, Jennifer S. (Associate Solicitor, U.S. Department of Labor)

4. Finch, Lindsey Adams (Appellee/ Employer)

5. Goldberg, Rachel (Counsel for Appellate Litigation, U.S. Department of Labor)

6. J.H. Zidell, P.A. (Appellant Counsel/ Employee Counsel)

7. Marcus, Sarah K. (Deputy Associate Solicitor, U.S. Department of Labor)

8. Murphy, Melissa (Senior Attorney, U.S. Department of Labor)

9. Nanda, Seema (Solicitor, U.S. Department of Labor)

10. Poe, Katelyn J. (Senior Attorney, U.S. Department of Labor)

11. Samuel, Anand Adrian (Appellee/ Employer)

12. Scola, Honorable Robert N.  (U.S. District Judge)

13. The Law Offices of Mark J. Beutler, P.A. (Appellees' Counsel/ Employers' Counsel)

14. Walsh, Martin J. ( Secretary, U.S. Department of Labor, Amicus Curiae)

15. Zidell, J.H. (Appellant Counsel/ Employee Counsel)

J.H. Zidell, PA is aware of no publicly traded company or corporation that has an interest in the outcome of this appeal.

## CORPORATE DISCLOSURE STATEMENT

J.H. Zidell, P.A. has no parent corporation and there are no publicly held corporations that own 10% or more of its stock.

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant requests an oral argument for this appeal. In light of the complex legal and factual issues extant herein, oral argument will benefit the Court to adjudicate this matter.

# **TABLE OF CONTENTS**

<u>Page</u>

CERTIFICATE OF INTERESTED PERSONS ....................................................... ii

CORPORATE DISCLOSURE STATEMENT…………………………………iii

STATEMENT REGARDING ORAL ARGUMENT ..............................................iv

TABLE OF CONTENTS..........................................................................................v

TABLE OF CITATIONS ..................................................................................... vii

JURISDICTIONAL STATEMENT…………………………………………..1

STATEMENT OF THE ISSUES..............................................................................2

SUMMARY OF THE ARGUMENT .......................................................................3

STATEMENT OF THE CASE AND FACTS ..........................................................5

ARGUMENT AND AUTHORITIES.....................................................................20

    i.    The Domestic Employee Overtime Exemption Does Not Bar  Blanco's Overtime Claims Since Blanco Did Not Reside In The Employers' Residence During The Relevant Time Period 2019-2021 And The Department Of Labor Rule 2013 Does Not Apply To A Night Shift Worker…………………………………………………………………..20

    ii.    There Are Three Tiers To The DOL's Final Rule 2013- None Of Which Apply To Blanco's Work As A Night Shift Nanny……………………24

    iii.    Blanco's Sleep Time Does Not Qualify For Rule 2013's Criteria……..30

    iv.    Not Only Did Blanco's Sleep Time Not Qualify For The DOL's 2013 Final Rule Overtime Exemption, But Blanco Was Never Provided A Separate Room By Employers…………………………………………….40

v.   Employers were Blanco's F.L.S.A. employers…………………………44

CONCLUSION .......................................................................................49

CERTIFICATE OF COMPLIANCE ......................................................49

CERTIFICATE OF SERVICE ...............................................................50

## <u>TABLE OF CITATIONS</u>

**Page(s)**

## <u>Cases</u>

*Acosta v. Lifetime Living, Inc.*, No. 7:18-CV-191, 2020 WL 10758976, at *5 (S.D. Tex. June 4, 2020)……………………………………………………………..23

*Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981)…………………………………………………………30

*Bartels v. Birmingham*, 332 U.S. 126, 130 (1947)………………………………..44

*Blanco v. Samuel*, No. 21-24023-CIV, 2022 WL 3139189, at *5 (S.D. Fla. Aug. 5, 2022)………………………………………………………………37, 41, 44

*Blanco v. Samuel*, No. 21-24023-CIV, 2022 WL 5241893, at *2 (S.D. Fla. Oct. 6, 2022)…………………………………………………………………………33

*Chao v. Jasmine Hall Care Homes, Inc.*, No. 205-CV-1306-GEB-KJM, 2007 WL 4591438, at *2–3 (E.D. Cal. Dec. 28, 2007)…………………………………38, 39

*Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1178 (11th Cir. 2009)………..26

*Crowe v. Coleman*, 113 F.3d 1536, 1542 (11th Cir. 1997)………………………26

*Encino Motorcars, LLC v. Navarro* (US S.Ct. 2018)……………………..20, 24, 44

*Feliciano*, 707 F.3d at 1251, 1252, 1253…………………………………………31

*Giguere v. Port Res. Inc.*, 927 F.3d 43, 47, 48, 50 (1st Cir. 2019)……………30, 42

*Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972)…………………..26

*Gregory v. First Title of Am., Inc.*, 555 F.3d 1300, 1302 (11th Cir. 2009)…...20, 43

*Hill v. Federal Trade Comm'n*, 124 F.2d 104, 106 (5th Cir. 1941)………………26

*Lange v. Tampa Food & Hosp., Inc.*, No. 8:19-CV-34-CEH-CPT, 2021 WL 678591, at *7 (M.D. Fla. Feb. 22, 2021)…………………………………………..45

*Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 158, 127 S. Ct. 2339, 2341, 168 L. Ed. 2d 54 (2007)…………………………………………………………..47

*Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 330-331 (5th Cir. 2000)………………………………………………………………………………..4

*Manrique v. Schoenbaum*, No. 1:09-CV-3212-SCJ, 2011 WL 13269434, at *5-7 (N.D. Ga. Aug. 12, 2011)……………………………………………………4, 41

*Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)………………………….31

*Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2008) ……………………………………………………………………………...…...20

*Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1364 (11th Cir. 1977)………………………………………………………………………...…..20

*Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 578, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942)……………………………………………………………………….30

*Perez v. Fla. Beauty Flora, Inc.*, No. 20-21773-CIV, 2021 WL 1581925, at *12 (S.D. Fla. Mar. 24, 2021), report and recommendation adopted, No. 20-21773-CIV, 2021 WL 1579690 (S.D. Fla. Apr. 22, 2021)……………………………….31

*Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311, 1312 (11th Cir. 2013)……………………………………………………………………..44, 45

*Starbuck v. R.J. Reynolds Tobacco Co.*, 349 F. Supp. 3d 1223, 1233 (M.D. Fla. 2018)……………………………………………………………………………26

*Tahirou v. New Horizon Enterprises, LLC*, No. 3:20-CV-00281 (SVN), 2022 WL 510044, at *6 (D. Conn. Feb. 21, 2022)………………………………………..42

*Teleglobe USA Inc. v. BCE Inc.*, 493 F.3d 345, 377 (3d Cir. 2007)………………26

*United States v. Sabhnani*, 599 F.3d 215 (2d Cir. 2010)…………………………41

*Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311–12 (5th Cir. 1976)…………..45

*U.S. Dep't of Labor, Wage & Hour Div., Memorandum 88.48*, 1988 WL 614199, at *1 (June 30, 1988) ("1988 Memorandum")…………………………………………23

*Venturella,* 391 F.3d at 125……………………………………………………….41

*Watkins v. United Needs & Abilities, Inc.*, No. CV RDB-20-0681, 2021 WL 2915265 (D. Md. July 12, 2021)……………………………………………………….42

## Statutes/ Regulations

*1974 U.S.C.C.A.N. 2811, 2845*……………………………………………………43

*DOL 2013 Final Rule*…..………………..2, 3, 21, 23, 24, 25, 26, 27, 28, 29, 30, 49

*29 C.F.R. § 552*……………………………………………………………...38, 40

*29 C.F.R. § 552.102*…………………………………………………...30, 40

*29 C.F.R. § 552.3*………………………………………………………….47

*29 C.F.R. § 785.21*……………………………………………………..36, 42

*29 C.F.R. § 785.22*……………………………………………………..36, 42

*29 C.F.R. § 785.23*…………………………………...30, 35, 36, 37, 38, 39, 40, 42, 44

*29 U.S.C. § 203(d)*……………………………………………………...4, 44

*29 U.S.C. § 203(e)(1)*………………………………………………………..44

*29 U.S.C. § 213(a)(1)*………………………………………………………4

*29 U.S.C. § 213(b)(21)*………………………………..2, 3, 28, 31, 38, 39, 41, 43, 44, 47

*29 U.S.C. § 216(b)*…………………………………………………………….i

*78 F.R. at 60454-01*……………….………..…………………………………24

*78 F.R. at 60473*………………………………………………………...2, 3, 23

*78 F.R. at  60,454*……………….…………………………………38, 40

*78 F.R. at  60,474*……………….…………………………………38, 40

ix

## **Statement As To Jurisdiction:**

Pursuant to Fed. R. App. P. 28(a)(4), this Court has jurisdiction as follows:

a)      This case involved a claim under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219.  The district court therefore had subject matter jurisdiction under 28 U.S.C. § 1331.

b)      This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 because it involves the appeal of a final decision of a District Court disposing of post judgment proceedings.

1

**<u>Statement of the Issues:</u>**

1. Whether the overtime wage exemption found at 29 U.S.C. 213(b)(21) (Domestic live in exemption) as interpreted by The DOL's 2013 FINAL RULE, 2013 Final Rule, 78 FR at 60473 *can* apply to a night shift nanny who does not reside with the Employers and spends all of her work time with the Employers' young children?

2. Was Summary Judgment erroneously *granted* based on The DOL's 2013 FINAL RULE, 2013 Final Rule, 78 FR at 60473 in light of disputed material facts relating to Employee's sleep time, freedom (or lack thereof) to pursue her own personal matters during work time, and *absence* of a private room/quarters being provided to Employee by Employers?

3. Was summary judgment erroneously *denied* finding that there was a material fact dispute as to whether the Employers were Employee's employers?

## **Summary of the Argument[1]:**

Summary Judgment was wrongly entered for the Employers. The overtime wage exemption found at 29 U.S.C. 213(b)(21) (Domestic live in exemption) as interpreted by The DOL's 2013 FINAL RULE, 2013 Final Rule, 78 FR at 60473 *cannot* apply to Blanco -- a night shift nanny-- who does not reside with the Employers and spends all of her work time watching and caring for the Employers' young children. Summary Judgment was, at a minimum, erroneously *granted* based on the DOL's 2013 FINAL RULE, 2013 Final Rule, 78 FR at 60473 in light of disputed material facts relating to Blanco's sleep time, freedom (or lack thereof) to pursue her own personal matters during work time, and *absence* of a private room/quarters being provided to Blanco by Employers.  Summary judgment was erroneously *denied* finding that there was a material fact dispute as to whether the Employers were Blanco's employers. The overwhelming evidence showed that Blanco was economically dependent on Employers, the Employers directly and indirectly controlled Blanco's work, the Employer(s) issued a W-2 to Blanco for 2019 and issued many months of wages directly to Blanco before using another one their nannies to do the same. Blanco, as a night shift nanny, had no special skill and

---

[1] Appellant herein referred to as "Blanco"; Appellee Lindsey Adams Finch hereinafter referred to as "Finch": Appellee Anand Adrian Samuel hereinafter referred to as "Samuel"; Appellees collectively hereinafter referred to as "Employers"

made a fixed wage and was not subject to profit or loss working for Employers. Summary judgment should have been entered finding that the Employers were Blanco's FLSA employers for the relevant years 2019-2021, based on the F.L.S.A. expansive definition of "employer" found at 29 U.S.C. 203(d) and case law interpreting the same.

## **<u>Standard of Review:</u>**

See also <u>*Lott v. Howard Wilson Chrysler-Plymouth, Inc.*</u>, 203 F.3d 326, 330-331 (5th Cir. 2000) ("The decision whether an employee is exempt from the FLSA's overtime compensation provisions under 29 U.S.C. § 213(a)(1), is primarily a question of fact which must be reviewed under the clearly erroneous standard. However, the ultimate decision whether the employee is exempt from the FLSA's overtime compensation provisions is a question[ ] of law.") (citations omitted)." <u>*Manrique v. Schoenbaum*</u>, No. 1:09-CV-3212-SCJ, 2011 WL 13269434, at *5 (N.D. Ga. Aug. 12, 2011).

**Statement of the Facts:**

For the relevant years to this case, the Employers had several nannies around-the-clock.  [*ECF* 60-5, P.133, L.18-25]; [*ECF* 93-3, P.13, L.7-10; P.19, L.20-24]. Blanco worked during 2019-2021 as a full-time nanny/housekeeper for the Employers. [*ECF* 43-12]; [*ECF* 93-1, P.13, L.2-6; P.16, L.15-17; P.42, L.13-18; P.63, L.21-P.66, L.11; P.76, L.19-P.78, L.25]; [*ECF* 93-4, P.47, L.15-23; P.84, L.13-P.85, L.25; P.91, L.5-19]. Blanco's job schedule and duties remained the same from January 2019 to August, 2021. [*ECF* 93-1, P.37, L.15-25].  Some of Blanco's work occurred at the Employers' home on Froude Street and Blanco provided no equipment of her own to perform her babysitting/nanny duties. Blanco also worked in the Employers Harbor House condominium prior to that. [*ECF* 93-1, P.20, L.12-16; P.27, L.20-25]; [*ECF* 93-4, P.47, L.15-P.48, L.6]; [*ECF* 93-3, P.59, L.1-P.61, L.3]; [ECF 104-1, P.11, L.19-P.12, L.2]. The only ones who lived in the Employers' condominium and, later, Froude Street home, were their (4) young daughters during the relevant time period. [*ECF* 93-4, P.41, L.21-24; P.13, L.5-8; P.30, L.19-25]. The Froude Street home had (3) bedrooms and (2) bathrooms. [*ECF* 60-5, P.104, L.19-21]; [*ECF* 93-2, P.40, L.5-23]; [*ECF* 93-1, P.52, L.2-16]; [*ECF* 93-4, P.16, L.19-P.17, L.3; P.31, L.9-16; P.41, L.2-9]. The children's ages ranged from less than one year old to 7 years old. Employers now have 5 children. [*ECF* 60-5, P.9, L.5-6; P.10, L.11-23]; [*ECF* 60-6, P.9, L.14-18]; [*ECF* 93-2, P.14, L.21-P.15, L.5; P.15, L.21-

P.16, L.4]; [*ECF* 93-4, P.46, L.12-14]. At the Froude home, the Employers shared a bedroom and one of the two bathrooms. The other (2) bedrooms and remaining bathroom were shared by Blanco and the two youngest children in one room and the other two children in the remaining room. The remaining bathroom was always shared by the (4) children and the nanny. [*ECF* 43-14, P.13, L.24-P.14, L.1]; [*ECF* 93-1, P.52, L.17-P.53, L.11]; [*ECF* 93-2, P.147, L.13-P.155, L.5]; [*ECF* 93-3, P.61, L.25-P.62, L.5; P.77, L.4-12]; [*ECF* 93-4, P.41, L.10-17; P.41, L.25-P.43, L.; P.117, L.24-P.118, L.3]. During the night shift at the Froude home, Blanco stayed in a room with the two youngest of the Employers' children. Blanco always slept with the Employers' 2 youngest daughters at the Froude home. At the Harbor House condo, Blanco slept in a room with all of the Employers' (4) children like the nanny Shane Thompkins did prior. [*ECF* 93-1, P.50, L.25-P.52, L.1; P.52, L.24-P.53, L.11; P.66, L.12-24]; [*ECF* 93-3, P.32, L.18-P.34, L.6; P.57, L.16-19; P.59, L.1-P.61, L.3 ; P.61, L.17-21; P.77, L.4-12]; [*ECF* 93-4, P.46, L.15-P.47, L.14]. From January 2019 to March or April 2020, Blanco stayed in one bedroom with Employers' (4) daughters while at the Condominium in Surfside Florida-including a newborn daughter for at least some of this time period. Blanco never had her own private room at the Employers' home and did not store any of her clothes there either. She always shared a bathroom with the Employers' (4) young children. [*ECF* 93-1, P.53, L.9-11; P.70, L.7-12; P.121, L.15-24; P.122, L.13-17; P.136, L.3-20; P.140, L.11-P.141, L.7];

[*ECF* 93-2, P.147, L.13-P.155, L.5]; [*ECF* 93-3, P.61, L.25-P.62, L.5]; [*ECF* 93-4, P.44, L.7-15]. Blanco never lived in the Employers' residence: she was a not a "live-in" domestic worker. [*ECF* 93-1, P.10, L.4-19; P.11, L.3-9; P.71, L.12-16; P.72, L.10-P.73, L.7; P.138, L.21-P.139, L.14; P.143, L.9-P.144, L.6]; [*ECF* 93-3, P.57, L.4-15]; [*ECF* 93-4, P.36, L.17-25; P.43, L.8-P.44, L.6; P.49, L.13-P.50, L.5; P.57, L.3-14; P.90, L.10-25]. Blanco resided with her Aunt or elsewhere in an apartment in Miami during the relevant time period. [*ECF* 93-1, P.10, L.4-19; P.11, L.3-9; P.71, L.12-16; P.72, L.10-P.73, L.7; P.138, L.21-P.139, L.14; P.143, L.9-P.144, L.6]. Blanco always brought a change of night clothes with her overnight bag when she started her shift at 7pm and always left the Employers' home with the same overnight bag mwhen her shift ended and returned at 7pm when her shift commended anew. [*ECF* 93-3, P.57, L.4-15]; [*ECF* 93-4, P.36, L.17-25; P.43, L.8-P.44, L.6; P.49, L.13-P.50, L.5; P.57, L.3-14; P.90, L.10-25]. Blanco did not have a key to Employers' home. [*ECF* 93-1, P.124, L.6-13]. None of the Employers' nannies lived in the Froude home nor in the apartment in Bal Harbor called the Harbor House. [*ECF* 93-4, P.40, L.20-P.41, L.1; P.52, L.19-P.53, L.2; P.58, L.10-16]. Finch paid for the nannies and Samuel paid all other household expenses such as rent, electricity, water and entertainment for the children. [*ECF* 60-5, P.31, L.3-5]; [*ECF* 60-10, P.6, L.20-22; P.65, L.9-25]; [*ECF* 93-1, P.120, L.15-25]; [*ECF* 93-2, P.35, L.12-17; P.36, L.1-24; P.38, L.15-23; P.41, L.20-P.43, L.25]; [*ECF* 93-4,

P.44, L.21-24; P.99, L.20-P.101, L.3];. Samuel participated in the hiring decision or ratified same and was present most nights in the Froude house while Finch was not usually home between at least 7am to 7pm. [*ECF* 60-5, P.58, L.2-18]; [*ECF* 60-10, P.8, L.1-9; P.52, L.7-25; P.54, L.23-P.56, L.10; P.66, L.1-12]; [*ECF* 60-6, P.11, L.12-20]; [*ECF* 93-1, P.55, L.3-10; P.87, L.10-P.88, L.5]; [*ECF* 93-2, P.21, L.4-19; P.136, L.19-P.138, L.18];; [*ECF* 93-3, P.68, L.1-16]; [*ECF* 93-4, P.44, L.25-P.45, L.10; P.53, L.3-P.54, L.17; P.55, L.3-P.56, L.20; P.80, L.17-20; P.94, L.7- P.95, L.11]. Samuel monitored the home via security cameras and controlled the nannies. [*ECF* 60-6, P.11, L.12-20]; [*ECF* 93-2, P.136, L.19-P.138, L.18]; [*ECF* 93-4, P.94, L.11-P.95, L.11]. The Employers hired Blanco and the Employers terminated her employment. [*ECF* 93-1, P.19, L.19-P.20, L.11; P.20, L.17-P.21, L.4; P.30, L.17-20; P.36, L.21-P.37, L.9; P.43, L.2-22; P.142, L.1-23; P.144, L.18-22]. Samuel wrote Blanco a recommendation letter to present to prospective employers and later disavowed the same. [*ECF* 93-1, P.128, L.1-12; P.128, L.21-P.129, L.9]; [*ECF* 93-2, P.122, L.17-P.124, L.15; P.125, L.23-P.126, L.9; P.127, L.12-P.133, L.13; P.135, L.22-P.136, L.1; P.137, L.15-P.138, L.18; P.176, L.18-P.179, L.16]; [*ECF* 43-12]. Finch is a licensed New York Attorney for many years, Harvard Law graduate, and practiced law in New York for large Firms internationally. [*ECF* 43-16, P.11, L.4-8]; [*ECF* 60-5, P.6, L.3-P.7, L.7; P.13, L.16-P.14, L.25]; [*ECF* 60-10, P.14, L.8-19]; [*ECF* 93-2, P.30, L.21-P.32, L.9; P.65, L.25-P.66, L.3]. However, she states she does

not know what overtime is. [*ECF* 60-5, P.123, L.17-P.125, L.21]. Finch decided to leave the practice of law and enrolled in the University of Miami Medical School in 2014, and later became a Resident OBGYN at Jackson Memorial Hospital where she remained for the relevant years for this lawsuit 2019-2021. [*ECF* 60-5, P.11, L.5-24; P.56, L.18-23]; [*ECF* 60-10, P.14, L.17-24]; [*ECF* 93-2, P.32, L.10-17; P.33, L.13-22]. Samuel graduated from Harvard law school but does not know what "law school" means. [*ECF* 93-2, P.184, L.3-P.185, L.6; P.186, L.14-21]; [*ECF* 43-16, P.11, L.9-P.13, L.12]. Samuel disavows knowledge as well. [*ECF* 93-2, P.16, L.23-P.17, L.15; P.21, L.4-P.22, L.6; P.26, L.4-11; P.27, L.18-P.28, L.2; P.31, L.6-P.32, L.2; P.41, L.20-P.42, L.4; P.45, L.10-17; P.47, L.2-17]. Employers stated they do not know what a live-in housekeeper/nanny means nor do they know what "to reside" means yet their prior nanny Isabella Toribio, states Employers know well what a live-in housekeeper/nanny is. [*ECF* 60-5, P.101, L.24-P.103, L.24; P.119, L.9-P.121, L.20] ; [*ECF* 60-10, P.31, L.23-P.32, L.23]. Finch started having babies close to the date when she started Medical School. [*ECF* 60-10, P.64, L.16-22]. In 2015-2016, Employers hired a nanny named Martha Isabella Toridio ("Isabella") and instructed her to open a nanny business (Nannies With Love) so that the Employers wouldn't have to pay employee taxes and to avoid overtime pay to their nannies. [*ECF* 60-10, P.4, L.7-10; P.5, L.25-P.6, L.3; P.7, L.7-20; P.11, L.13-19; P.12, L.15-P.13, L.1; P.14, L.1-7; P.17, L.8-11; P.23, L.11-20, P.23, L.25-P.24, L.9;

9

P.31, L.3-17]; [*ECF* 93-1, P.21, L.2-12]. Isabella opened Nannies with Love LLC and paid the Employers' nannies through that business based on the Employers' instructions to her. [*ECF* 60-10, P.5, L.25-P.6, L.3; P.17, L.8-11; P.23, L.11-20; P.31, L.6-13]; [*ECF* 93-1, P.21, L.2-12]. Employers told Isabella that there was no overtime pay for their nannies because they couldn't afford it [*ECF* 60-10, P.16, L.5-12] and that Samuel told her that he didn't understand why Finch kept having babies—only to be raised by around-the-clock nannies. [*ECF* 60-10, P.66, L.10-19]. Isabella also worked as a nanny for Employers and regularly worked well over 40 hours per week and was not paid overtime wages. [*ECF* 60-10, P.12, L.7-14; P.13, L.21-25]; [*ECF* 93-3, P.6, L.10-22]. Nannies With Love was funded 100% with Finch's money and paid each of the Employers' nannies the exact amount received from Finch to pay each nanny's wages. [*ECF* 60-10, P.6, L.16-19; P.36, L.6-18]; [*ECF* 93-3, P.25, L.23-P.26, L.2]. Nannies with Love made no financial profit during the years that Isabel worked as the Employers' nanny. [*ECF* 60-10, P.6, L.23-P.7, L.6; P.26, L.7-24; P.40, L.2-22]. Nannies with Love never employed the Employers' nannies, but rather was utilized to pay the latter so that the Employers would avoid paying employee taxes and overtime pay. [*ECF* 60-10, P.4, L.25-P.5, L.24; P.6, L.4-15; P.23, L.11-20; P.63, L.1-8]; [*ECF* 93-1, P.144, L.7-11]; [*ECF* 93-3, P.28, L.20-P.29, L.7; P.78, L.16-18]. Blanco and the other nannies were always the Employers' employees, were controlled by the Employers and were financially dependent on the

Employers for the years that Nannies with Love was exclusively funded by the Employers which was 2016-2018. [*ECF* 60-10, P.13, L.2-5; P.17, L.19-P.18, L.11; P.23, L.6-20; P.30, L.16-P.31, L.13; P.35, L.20-25; P.50, L.20-P.51, L.9]; [*ECF* 93-1, P.36, L.21-P.37, L.17; P.40, L.17-21; P.41, L.20-24; P.43, L.2-22; P.58, L.6-P.59, L.11 ; P.81, L.12-P.82, L.2; P.90, L.4-7; P.99, L.18-24; P.119, L.13-20; P.129, L.15-19; P.141, L.8-25 ; P.144, L.18-22; P.147, L.16-20]; [*ECF* 93-2, P.143, L.25-P.144, L.16]; [*ECF* 93-3, P.6, L.13-17; P.8, L.6-11; P.9, L.5-10; P.14, L.4-13; P.23, L.23-P.24, L.2; P.24, L.20-P.25, L.1; P.42, L.6-20; P.44, L.9-19; P.45, L.4-P.46, L.16; P.47, L.9-23; P.50, L.19-23; P.69, L.19-P.70, L.9; P.74, L.11-P.75, L.11; P.77, L.4-24; P.81, L.14-24]; [*ECF* 93-4, P.9, L.16-19; P.10, L.6-14; P.12, L.8-13; P.13, L.19-P.14, L.21; P.15, L.17-24; P.79, L.14-P.80, L.14; P.80, L.21-P.81, L.21; P.85, L.20-25; P.91, L.5-P.93, L.11]. Isabella testified that Finch said that she didn't like babies at all and was only having them to fulfill her mother's wishes to propagate the "Finch" family name as they come from prestigious lineage from one of the United States Presidents. [*ECF* 60-10, P.14, L.25-P.16, L.4; P.63, L.15-P.65, L.8]. Employers agreed to reimburse Isabella for the taxes paid by Nannies with Love which were incurred in connection with the Employers' nannies who were paid through Nannies with Love. [*ECF* 60-10, P.4, L25-P.5, L.11; P.28, L.15-P.30, L.3; P.34, L.5-19; P.36, L.19-P.37, L.20; P.63, L.9-14]. Isabella paid Adrianna $650 weekly- the exact amount of money each week that Finch paid to Isabella for

11

Adrianna's work. [*ECF* 60-10, P.24, L.10-19]; [*ECF* 93-3, P.25, L.23-P.26, L.2; P.42, L.6-20; P.52, L.20-25]. In 2017, after Finch birthed her third daughter, Shane Thompkins was one of the nannies that Isabella found to work the night shift from 7pm to 7am- 5 days for 60 hours per week. [*ECF* 60-10, P.31, L.18-22; P.33, L.4-9]; [*ECF* 93-1, P.29, L.19-21; P.30, L.4-8]; [*ECF* 93-3, P.31, L.9-25]; [*ECF* 93-4, P.27, L.18-24; P.30, L.3-10]. Finch paid Isabella $600 weekly for Thompkins' work which Isabella, in turn, paid Thompkins through Nannies with Love. [*ECF* 60-10, P.8, L.10-13]. In 2018, Blanco, worked as the Employers' "Sunday" Nanny from 10am to 7pm. [*ECF* 60-10, P.25, L.18-P.26, L.6; P.30, L.4-15]; [*ECF* 93-1, P.16, L.18-25; P.17, L.20-P.18, L.10; P.19, L.2-14; P.26, L.9-12; P.29, L.13-18; P.47, L.11-24; P.48, L.12-15]. Towards the end of the year 2018, Isabella was offered cocaine by Thompkins and had witnessed her stealing items from the Employers. [*ECF* 60-10, P.9, L.5-13; P.19, L.10-15; P.27, L.8-P.28, L.4; P.43, L.8-12; P.44, L.18-P.45, L.23; P.67, L.13-15]. Isabella also witnessed Thompkins and Samuel drinking wine together, at night on multiple occasions, at the Employers' residence with Thompkins dressed in provocative sleepwear while Finch was absent. [*ECF* 60-10, P.8, L.15-25; P.19, L.25-P.20, L.19; P.44, L.13-17]. Isabella told Finch of Samuel's and Thomkins' "encounters", as it had happened several times prior, and Finch told her it was for the best as Finch would not need to tend to Samuel as much as a result thereof. [*ECF* 60-10, P.9, L.16-24; P.20, L.9-P.21, L.6; P.28, L.6-12].

Isabella then conducted a criminal background search for Thompkins which revealed that she had a prior criminal conviction of theft from the elderly. [*ECF* 60-10, P.18, L.21-P.19, L.24; P.68, L.22-P.69, L.9]. Isabella then told the Employers of Thompkins' prior theft, cocaine possession, and told them to terminate Thompkins immediately. [*ECF* 60-10, P.9, L.14-16; P.69, L.4-12]. The Employers told Isabel to ignore Thompkins' behavior and that they would not terminate Thompkins and wanted her to remain as their children's nighttime nanny. [*ECF* 60-10, P.9, L.14-P.11, L.3; P.21, L.6-P.22, L.2; P.67, L.16-22; P.69, L.4-12]. Thereafter, Isabella decided to immediately quit her employment as Employers' nanny. [*ECF* 60-10, P.27, L.5-P.28, L.4; P.67, L.16-22]; [*ECF* 93-3, P.40, L.6-22]. Isabella told Adrianna to quit also at that time but Adrianna refused because Finch told her to keep working as normal. [*ECF* 93-3, P.40, L.23-P.42, L.5; P.45, L.4-18]. Employers then hired Grace Trask to replace Isabella in 2018 as their daytime nanny along with Adrianna. Grace Trask was to work from 7am to 7pm for (5) days per week. [*ECF* 93-3, P.46, L.17-22; P.55, L.6-16]; [*ECF* 93-4, P.9, L.2-5; P.12, L.14-P.13, L.4; P.14, L.20-P.15, L.11; P.44, L.16-20; P.11, L.1-P.12, L.7; P.13, L.1-14]. Grace Trask was 23 years old when she started working for the the Employers and relied on them to pay her and the other nannies correctly since the Employers were both attorneys. [*ECF* 93-3, P.53, L.23-25]; [*ECF* 93-4, P.5, L.13-15; P.51, L.25-P.52, L.18]. Finch prompted Grace Trask to open Amazing Gracie, LLC. as Finch did prior with nanny

13

Isabella Toribio. [*ECF* 60-10, P.5, L.25-P.6, L.3; P.17, L.8-11; P.23, L.11-20; P.31, L.6-13]; [*ECF* 93-1, P.21, L.2-12]; [*ECF* 93-4, P.17, L.24-P.19, L.7; P.19, L.25-P.20, L.3; P.20, L.23-P.22, L.5; P.22, L.18-23; P.99, L.2-8; P.114, L.16-P.115, L.13]. Grace opened Amazing Gracie LLC to pay the Employers' nannies with the money that Finch paid her after Finch suggested that she do so. [*ECF* 93-3, P.51, L.9-P.52, L.19; P.54, L.1-13]; [*ECF* 93-4, P.23, L.4-14]. Nanny Shane Thompkins died on January 21st, 2019 after being murdered by her boyfriend. [*ECF* 60-10, P.11, L.5-12; P.28, L.6-14; P.42, L.3-12]; [*ECF* 93-1, P.30, L.21-P.31, L.2]. Employers decided to have Blanco cover their prior nanny Thompkins' shift, after she died on January 21st, 2019. Thompkins nanny shift was from 7pm to 9am (5) days per week. Blanco immediately assumed Thompkins shift and also retained her Sunday 10am to 7pm shift that she had worked prior for the Employers in 2018. [*ECF* 93-1, P.30, L.13-24; P.34, L.12-P.36, L.20; P.47, L.25-P.48, L.3]; [*ECF* 93-2, P.62, L.23-P.63, L.12; P.86, L.16-P.87, L.3]; [*ECF* 93-3, P.37, L.13-P.38, L.2; P.39, L.1-13]; [*ECF* 93-4, P.33, L.17-P.36, L.16; P.38, L.2; P.63, L.23-P.64, L.3]. Blanco's new schedule during the relevant time period was then Sunday 10am to 7pm and Sunday-Friday 7pm to 9am for a total of 79 hours weekly. [*ECF* 93-2, P.84, L.13-P.85, L.18; P.88, L.14-P.89, L.23]. [*ECF* 93-4, P.68, L.12-P.70, L.17]. Blanco relieved Adrianna of her nanny duties at 7pm and worked until 9am the following morning when Grace relieved Blanco of her duties. [*ECF* 93-1, P.62, L.18-22; P.123, L.10-20]. Blanco

14

was paid $800 weekly for her nanny work for the Employers. [*ECF* 93-4, P.68, L.18-25]. Grace Trask opened Amazing Gracie LLC as a favor to the Employers, never charged any money to process Employers' nanny payments through Amazing Gracie LLC. and never received any financial reward for doing so. [*ECF* 93-4, P.23, L.19-P.26, L.4; P.33, L.1-7; P.39, L.5-22; P.96, L.2-13; P.115, L.3-P.116, L.3]. There was no written contract between the Employers and Amazing Gracie LLC nor between the latter and any of the Employers' nannies who were paid through this LLC. [*ECF* 60-6, P.25, L.2-5]; [*ECF* 93-4, P.95, L.12-P.96, L.1]. Amazing Gracie LLC only processed weekly payments for the Employers' nannies and nobody else. [*ECF* 93-3, P.50, L.19-23]; [*ECF* 93-4, P.116, L.4-9]. Finch's money was the only income for Amazing Gracie LLC for the relevant years for this case. [*ECF* 93-4, P.116, L.4-9]. For part of the relevant time period, Grace Trask paid Blanco the same pre-determined amount weekly that Blanco was paid directly by Finch prior. Finch then paid Blanco's wages to Grace Trask via Amazing Grace LLC. [*ECF* 93-1, P.120, L.5-8; P.149, L.4-P.150, L.2]; ] [*ECF* 93-3, P.50, L.19-23; P.51, L.9-P.52, L.19; P.54, L.1-13]; [*ECF* 93-4, P.23, L.4-14; P.38, L.24-P.39, L.22; P.38, L.24-P.39, L.4; P.71, L.3-P.73, L.5; P.116, L.4-9]. Finch, at times, paid Grace for Blanco's work at a rate of $800 weekly which Grace, in turn, paid Blanco weekly by Zelle. [*ECF* 93-1, P.120, L.5-8; P.149, L.4-P.150, L.2]; [*ECF* 93-4, P.38, L.24-P.39, L.22; P.38, L.24-P.39, L.4; P.71, L.3-P.73, L.5]. Grace Trask was a regular nanny like the

15

others, did not determine or decide how much to pay Blanco, had no authority to hire and fire Blanco, never controlled Blanco's or any of the Employers' nannies as she had no authority to do so. [*ECF* 93-3, P.52, L.20-P.53, L.18]; [*ECF* 93-4, P.26, L.22-P.27, L.17; P.39, L.23-P.40, L.19; P.71, L.3-P.74, L.11; P.83, L.1-11]. The Employers controlled and/or supervised Blanco's work and schedule. [*ECF* 93-1, P.43, L.2-22; P.58, L.6-P.59, L.11; P.90, L.4-7; P.99, L.18-24; P.119, L.13-20; P.129, L.15-19; P.141, L.8-25; P.147, L.16-20]; [*ECF* 93-4, P.85, L.20-25]. Blanco was employed by the Employers just like all of the nannies who worked for them. [*ECF* 43-12]; [*ECF* 93-1, P.23, L.18-21; P.30, L.17-20; P.144, L.7-11]; [*ECF* 93-2, P.182, L.3-18]; [*ECF* 93-4, P.94, L.11-P.95, L.11].  Finch knew Blanco's and the other nannies' particular job duties (such as who was responsible for giving the children dinner or bathing them) and Finch knew the hours Blanco worked. [*ECF* 57-1, P. 1-2]; [*ECF* 93-1, P.43, L.2-22; P.58, L.6-P.59, L.11; P.90, L.4-7; P.99, L.18-24; P.119, L.13-20; P.129, L.15-19; P.141, L.8-25; P.147, L.16-20]; [*ECF* 93-4, P.85, L.20-25]. Finch spoke with Blanco about sleeping arrangements. [*ECF* 93-1, P.106, L.10-P.107, L.1]. Grace Trask never employed Blanco nor any other nanny who worked for the Employers.  Grace, Adrianna and Blanco worked as a team. [*ECF* 93-1, P.144, L.7-11]; [*ECF* 93-3, P.55, L.1-5]; [*ECF* 93-4, P.27, L.10-13; P.50, L.21-P.51, L.24; P.71, L.3-P.73, L.5; P.118, L.25-P.119, L.12].

16

Employers never paid overtime wages to any of their nannies for their normal work shifts, including the Blanco and Grace Trask—both who regularly worked over 40 hours weekly for the Employers. When the nannies worked past their weekly shift hours, they were paid $15.00 per hour by Employers. [*ECF* 93-4, P.29, L.23-P.30, L.2; P.75, L.11-15; P.124, L.8-20; P.127, L.13-P.128, L.4]. Grace Trask had a messaging group chat with the Employers to discuss any matters having to do with their children and they equally responded and communicated with her in relation to the same. [*ECF* 93-4, P.91, L.12-P.93, L.2]. Many weekly payments were made directly from Finch to Blanco during the relevant years to this lawsuit even after the Grace Trask's LLC was brought in. [*ECF* 43-3, P.66, L.10-P.67, L.4]; [*ECF* 60-5, P.53, L.17-21; P.55, L.9-25; P.80, L.3-20]; [*ECF* 60-11, P.1-32]; [*ECF* 93-4, P.38, L.12-23]. Finch issued Blanco a W-2 Tax Form for 2019 only even though Blanco 's job and work schedule was always 79 hours weekly from 2019-2021(August). [*ECF* 43-10]. Finch made numerous payments directly to Blanco both before and after Amazing Gracie LLC was already being utilized as the "middle man". [*ECF* 60-11, P.1-24] Finch paid the nannies directly by personal check and disclosed the amounts paid to a payroll company – NannyChex, LLC – which made the payments to the taxing authorities and issued W-2s to the employees. Finch orchestrated her other payments to Blanco and the other nannies to pass through 3rd parties so she would avoid paying employee taxes and benefits and avoid overtime pay. [*ECF* 60-

17

10, P.4, L.7-10; P.4, L.25-P.6, L.19; P.7, L.7-10; P.7, L.11-20; P.11, L.13-19; P.12, L.15-P.13, L.1; P.14, L.1-7; P.16, L.5-12; P.17, L.8-11; P.23, L.11-20; P.23, L.25-P.24, L.9; P.31, L.3-17; P.36, L.6-18; P.63, L.1-8]; [*ECF* 93-1, P.21, L.2-12; P.144, L.7-11]; [*ECF* 93-3, P.25, L.23-P.26, L.2; P.28, L.20-P.29, L.7; P.78, L.16-18]. All nannies at the Employers' residence were controlled by and were financially dependent on them for the relevant time period; Amazing Gracie LLC was funded 100% by Finch and made no profit because it paid the same amount received by Finch directly to the Employers' nannies. [*ECF* 60-5, P.137, L.5-11]; [*ECF* 60-6, P.9, L.19-22; P.34, L.13-22; P.41, L.22-P.48, L.23; P.]; [*ECF* 93-1, P.40, L.17-21; P.43, L.2-22; P.56, L.23-P.57, L.6; P.58, L.6-P.59, L.11; P.81, L.12-P.82, L.2; P.86, L.5-P.87, L.9; P.90, L.4-7; P.90, L.13-18; P.92, L.24-P.93, L.13; P.94, L.6-9; P.95, L.14-P.96, L.3; P.97, L.22-P.98, L.9; P.99, L.18-24; P.105, L.11-20; P.141, L.8-P.142, L.23; P.147, L.16-20]; [*ECF* 93-3, P.48, L.12-19; P.52, L.20-P.53, L.7]; [*ECF* 93-4, P.23, L.19-P.26, L.4; P.33, L.1-7; P.39, L.5-22; P.51, L.12-24; P.71, L.3-P.73, L.5; P.83, L.25-P.84, L.23; P.124, L.1-7]. Blanco was financially dependent on her work for the Employers for the years 2019-2021. [*ECF* 60-11, P.1-32]; [*ECF* 93-1, P.16, L.4-14; P.120, L.2-8; P.142, L.1-19]. Employers stated they were scared of Blanco but continued to allow her work at their home with their minor children. [*ECF* 60-5, P.81, L.2-12; P.81, L.18-P.82, L.3; P.84, L.7-P.88, L.19; P.89, L.17-P.91, L.5]; [*ECF* 60-6, P.67, L.5-15]; [*ECF* 93-2, P.100, L.13-P.101, L.7; P.103,

L.18-P.104, L.10].  Blanco's "sleep time" with Employers was "on duty" time. [*ECF* 43-14, P.9, L.8-P.10, L.11; P.12, L.17-P.13, L.7; P.15, L.23-P.16, L.9; P.19, L.16-P.21, L.6]; [*ECF* 93-4, P.117, L.12-23; P.123, L.4-20]. Blanco was often up at night tending to the Employers' youngest children. [*ECF* 93-1, P.67, L.5-P.68, L.10; P.70, L.16-P.71, L.2; P.73, L.15-23; P.74, L.2-12; P.82, L.3-19; P.104, L.16-23; P.106, L.10-P.107, L.23; P.132, L.18-P.134, L.10]. Employers have no time records for Blanco's work. [*ECF* 60-6, P.23, L.13-22]; [*ECF* 93-1, P.122, L.18-P.123, L.5; P.123, L.10-20].

Argument:

### i.    The Domestic Employee Overtime Exemption Does Not Bar  Blanco's Overtime Claims Since Blanco Did Not Reside In The Employers' Residence During The Relevant Time Period 2019-2021 And The Department Of Labor Rule 2013 Does Not Apply To A Night Shift Worker

The U.S. Supreme Court's 2018 decision, _Encino Motorcars, LLC v. Navarro_ (US S.Ct. 2018),  held that FLSA exemptions are to be given a "fair reading"[2]. As will be discussed herein, the District Court appears to have constructed the subject exemption narrowly _against_ Blanco in this case and did _not_ apply a "fair reading" standard. The District Court construed the "live-in" domestic overtime exemption to apply to Blanco, who was a night shift nanny- who never resided nor lived-in with the Employers. Blanco, during the night shift, shared a room and bathroom with the Employers' minor children and does not qualify as an exempt employee as such. The claimed exemption is an affirmative defense that the Employers have the burden to prove.  The regulations cited herein focus on the term "residence" as being a place **"Where the facilities offered by the employer provide a home-like**

---

[2] Before this decision, the standard for FLSA exemption construction was "narrowly against the employer". "The Supreme Court has directed "that courts closely circumscribe the FLSA's exemptions." _Morgan v. Family Dollar Stores, Inc._, 551 F.3d 1233, 1269 (11th Cir. 2008) (quoting _Nicholson v. World Bus. Network, Inc._, 105 F.3d 1361, 1364 (11th Cir. 1977)). _Gregory v. First Title of Am., Inc._, 555 F.3d 1300, 1302 (11th Cir. 2009) ("It is well established that the employer "bears the burden of proving the applicability of a FLSA exception by clear and affirmative evidence.' ").

20

**environment…"** These Regulations, also appear to urge[3] that the subject employee be provided with a private room and facilities as a prerequisite to the exemption's application—neither of which exist in this case. The Order on Summary Judgment at DE 95, was entered based on the District Court's mistaken application of Department of Labor "DOL" Rule 2013 to bar Blanco's overtime wage claims. Blanco was a *night shift* worker who did not reside in the Employers' residence and, therefore, is not subject to Rule 2013 as a bar to her overtime wage claims.

Blanco's shift commenced at 7pm and ended at 9am the following day for six days per week PLUS Sundays from 10am to 7pm. The Employers first lived in a two bedroom, two bathroom condominium and later moved to a 3 bedroom, 2 bathroom, home for the relevant time period and had 4 young children—all of whom lived with them. The children's ages ranged from less than one years old to 7 years old. While at the two bedroom condominium, the Employers' four (4) young children stayed with the Blnaco in one of the bedrooms. After the Employers moved to their home on Froude Street, Blanco stayed in a room with the two youngest of the Employers' children until her employment ended in August, 2021. [DE 104-1, P.29, L.6-9].

---

[3] The Orders on appeal determined that the separate room requirement only applies to the compensability of time worked and is irrelevant to a determination of whether the domestic live-in exemption applies. Blanco believes that the relevant C.F.R. provisions cannot be read in a *vacuum* in order to construe the subject exemption narrowly in favor of the Employers. To read the exemption "fairly", a separate room may not be an absolute requirement but certainly is a highly relevant factor in determining whether Blanco "resided" with the Employers.

Blanco never had her own private room at the Employers' residences and did not store any of her clothes there either. She always shared a bathroom with the Employers' (4) young children during her shift. She always brought a change of night clothes with her each time she started her shift at 7pm and left the Employers' home at 9am with the same overnight bag. Blanco always left the Employers' home at 9am when her shift ended and returned at 7pm when her shift commended anew. During her shifts and days off (from 9am to 7pm weekdays and from Friday at 9am to Sunday at 10am) Blanco resided on her own and apart from the Employers' residences- usually with her Aunt  in an apartment in North Miami during the relevant time period. Blanco never had a key to the Employers' residences. Employer Finch is a licensed New York Attorney for many years and a Harvard Law School Graduate who now is an obstetrics Resident at Jackson Memorial Hospital. Samuel also has a law degree from Harvard. The Employers stated they don't know what a live-in housekeeper means nor do they know what "to reside" means.

As described above in the applicable facts, Blanco did not "live-in" nor "reside" with the Employers and was not provided a separate room to pursue her own personal matters for any of the relevant time period. What the  District Court missed is that Blanco's night-shift job's essential requirements involved her

22

sleeping/staying in a bedroom with the Employers' youngest daughters[4]. The Employers claim that Blanco should *not* be paid overtime pay for her time sleeping/staying with their children even though that was, per se, her most important job duty as a full time nanny. The Employers' reason that, since Blanco **stayed** at their home during 5 nights per week, the DOL Rule 2013 exempts her from overtime pay under the claimed exemption. The summary judgment order is not only counter-intuitive, but contrary to applicable law as well[5].

The DOL's 2013 FINAL RULE, 2013 Final Rule, 78 FR at 60473, as per its own preamble, aims to expand F.L.S.A. coverage for workers, "The major effect of

---

[4] Blanco stayed with all (4) children in one bedroom while at the Employers' condominium residence and later with the Employers' two youngest daughters at the Froude home.

[5] The regulation regarding the exclusion of sleep time is instructive as to the application of the subject exemption. While the District Court paid little, if no, homage to these related regulations before entering summary judgment for the Employers, Blanco believes they are necessary to consider in order to arrive at a "fair" reading of the domestic live-in overtime exemption. For example, the subject exemption requires that the domestic employee have periods of free time to pursue personal matters; a related "exclusion of sleep time" regulation lays out the relevant factors which, in turn, directly relate to the *absence* of free time the Blanco herein experienced. No evidence of any required element to exclude sleep time exists in this case. "*See U.S. Dep't of Labor, Wage & Hour Div., Memorandum 88.48*, 1988 WL 614199, at *1 (June 30, 1988) ("1988 Memorandum"). In relevant part, the 1988 Memorandum states:
In order to deduct sleep time for full-time and relief employees, such employees must be provided private quarters in a homelike environment. *Acosta v. Lifetime Living, Inc.*, No. 7:18-CV-191, 2020 WL 10758976, at *5 (S.D. Tex. June 4, 2020).

23

this Final Rule is that more domestic service workers will be protected by the FLSA's minimum wage, overtime, and recordkeeping provisions."  The Order on appeal misconstrues the Rule to exempt night-shift nannies  so long as they spend at least (5) five nights a week, working and sleeping,  at their employers' residence and in spite of whether they are working while on their employers' premises and are residing elsewhere. This microscopic interpretation of the subject Rule wholly ignores the Rule's stated purpose[6] as well as the DOL's examples incorporated to illustrate the Rule's intended application.  Moreover, the summary judgment does not reflect a "fair reading" of the subject exemption as per the Supreme Court's *Encino Motorcars, LLC v. Navarro* decision, as it narrowly construes the exemption in favor of the Employers.

ii.     **There Are Three Tiers To The Dol's Final Rule 2013- None Of Which Apply To Blanco's Work As A Night Shift Nanny**

Final Rule 2013, as applied to an employee who works less than 120 hours weekly, must be considered in light of the DOL's examples that are part and parcel

---

[6] "In 1974, Congress extended the protections of the Fair Labor Standards Act (FLSA or the Act) to "domestic service" employees,  ….. and it exempted from the Act's overtime provision domestic service employees who reside in the household in which they provide services. This Final Rule revises the Department's 1975 regulations implementing these amendments to the Act to better reflect Congressional intent given the changes to the home care industry and workforce since that time." Application of the Fair Labor Standards Act to Domestic Service, 78 FR 60454-01.

of this Regulation. The District Court looked only to the Rule's language concerning working *and* sleeping (5) nights per week at Employer's residence and concluded, albeit wrongly, that Blanco ( night shift nanny) is exempt from overtime since she slept *and* worked less than 120 weekly at the Employers' residence. The District Court rejected all of the Blanco's arguments that sleeping *while* working, for a shift worker, is not contemplated by Rule 2013 and otherwise turned a blind eye to the essential examples that the DOL provides to understand the intent of this Rule. Reversal should be required under these circumstances.

The DOL Field Assistance Bulletin number 2016-1, for example, defines sleep as "being able to enjoy an uninterrupted night's sleep." As discussed with the District Judge at the Summary Judgment Hearing [DE 104-1, P.23], other DOL regulations and opinions are necessary to fill in where Final Rule 2013 is lacking such as the meaning of "sleep time". Five hours of uninterrupted sleep is the benchmark definition of sleep time as per Field Assistance Bulletin number 2016-1. There is no evidence in this case that supports Blanco sleeping for (5) uninterrupted[7]

---

[7] Another DOL Regulation validates the five hours of uninterrupted sleep somewhat separated during the night so long as the employee is "being able to enjoy an uninterrupted night's sleep." The number of hours of sleep is not part of the record on appeal- no evidence supports a finding that Blanco slept for 5 uninterrupted hours continuous or broken-up per night while at the Employers' residence. In fact, Blanco's detailed deposition testimony is clear that she always was in "alert" mode when staying/sleeping in a room with the Employers' children and never "[was] able to enjoy an uninterrupted night's sleep." ECF 95's commentary at P. 5 regarding Blanco's briefing and legal Counsel having

25

hours; the general "sleep time" testimony[8] quoted in the orders on appeal are not

tantamount to "five hours of uninterrupted sleep for each work shift"[9]. Once again,

the District Court construed the subject exemption narrowly in the Employers' favor

---

established judicial admissions that Blanco slept with the Employers' children does *not* change this analysis. All references made according to "the judicial admissions doctrine" via counsel and pleadings did not address Blanco "being able to enjoy an uninterrupted night's sleep" nor refer to any *amount of hours* of uninterrupted sleep at all. This was explained to the District Court at the Summary Judgment Hearing. [ECF 104-1, P.24-25].

[8] The references to "sleep time" made by Blanco and/or her Counsel are not judicial admissions because they were not *clear and unequivocal statements* that proved the Employers' exemption *affirmative defense*; they were not "clear and unequivocal concessions" that were beyond evidence to contradict them. For example, none of the "judicial admissions" ever addressed the amount of Blanco's sleeping hour(s), whether the hours were uninterrupted, nor whether Blanco's sleep time would otherwise fit the DOL Final Rule 2013's definition of sleep time. In fact, Blanco's detailed deposition testimony, which ***preceded*** the "concessions" referenced in ECF 95, revealed that she was alert during all "sleep time" because her job was to care for the Employers' young children during the night shift. "A judicial admission is a statement by a party or its counsel that removes a factual issue from dispute in a litigation and binds both parties on trial and appeal. See *Cooper v. Meridian Yachts, Ltd.,* 575 F.3d 1151, 1178 (11th Cir. 2009) ("[F]acts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them.") (quoting *Hill v. Federal Trade Comm'n*, 124 F.2d 104, 106 (5th Cir. 1941) ). To be binding, a judicial admission must be "unequivocal" and "unambiguous." *Crowe v. Coleman*, 113 F.3d 1536, 1542 (11th Cir. 1997) (quoting *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972) ). Judicial admissions "must be statements of fact that require evidentiary proof, not statements of legal theories." *Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 377 (3d Cir. 2007)". *Starbuck v. R.J. Reynolds Tobacco Co.*, 349 F. Supp. 3d 1223, 1233 (M.D. Fla. 2018).

[9] "But, based on what the Plaintiff said, she did not have uninterrupted sleep at all in that room, much less five hours. And, the Defendant certainly has not proven that for the purposes of summary judgment." [ECF 104-1, P.43, L.1-4].

26

to bridge the gap between the former and the latter in order exempt Blanco's overtime claims. [ECF 104-1, PP. 24-25]. Reversal should be required accordingly.

Final Rule 2013's first tier applies to employees who live- in with their employer (7) days per week-are considered to reside with their employer. The second tier applies to employees who work and reside on their employer's premises for 120 hours weekly. The third tier is the one that this appeal concerns as the District Court found-albeit mistakenly- that Blanco was exempted from overtime pay because she met the third tier's definition of "reside" with her employer. Specifically, the District Court determined that Blanco worked 79 weekly hours and slept 5 nights weekly as a night shift nanny and, therefore, is exempted from overtime pay.

The District Court's microscopic interpretation of "works and sleeps less than 120 weekly" misses the mark by a long shot; the District Court ignored the DOL's examples following this prong of the 2013 Rule.

"The court order, on summary judgment, cites part of this DOL regulation, but does not cite the example that the DOL gives in relation thereto. And, that example is – and we think it is important -- says, from the 2013 final ruling, if less than 120 hours per week is spent working and sleeping on the employer's premises, five consecutive days or nights would also qualify as residing on the premises for extended periods of time. For example, employee resides on the employer' premises five consecutive days from 9:00 A.M. Monday until five P.M. Friday, (they are sleeping four straight nights on the premises), would be considered to reside on the employer's premises for an extended period of time. Similarly, an employee who resides on an employer's premises five consecutive nights from 9:00 P.M. Monday until 9:00 A.M. Saturday would also be considered to reside on the employer's premises for an

27

extended period of time. We think that this example is very important that the DOL cited in their final rule because it distinguishes between sleep time and work time. The example clearly states, at least in one of those examples above, that it is considering an employee who is working daytime hours and has a separate period for sleeping to herself.  At least, in this case, herself." **[ECF 104-1, P.5, L.17- P.6,L.14]**

According to the examples that the DOL uses along with Rule 2013, sleep time must be *separate*[10] from work time for a shift worker; when work and "sleep" overlap, Rule 2013 cannot apply to bar overtime wages for a night-shift nanny. Better said, when "sleep" is an integral part of the work, a *shift* worker should not be barred from overtime pay pursuant to this DOL provision. The third tier of Rule 2013 was read literally by the District Court to apply to bar overtime to all workers who work **and** sleep at least (5) nights weekly at their employer's residence in spite of their job duties and without regard to whether they are employed to "sleep". The Summary Judgment ruling cannot stand as it runs afoul of the purpose of the subject DOL Rule and against the import of the domestic employee overtime exemption found at 29 U.S.C 213(b)(21).

The DOL Fact Sheet 79*B*[11] is instructive as to the separation between work and sleep that must be present for the former and latter to peacefully coexist when

---

[10] *Every*  case cited to by the District Court in the order [ECF 82] in support of denying Blanco's Motion for Summary Judgment involved employees who worked *separate from* their sleep time unlike Blanco herein who was always with the Employers' children for the entirety of her night shift employment.

[11] The DOL issued this and other Fact Sheets to clarify Rule 2013 application.

constructing the third tier of DOL Rule 2013. Fact Sheet 79B uses an example of an employee who resides on the employer's premises five consecutive days from 9:00a.m. Monday through 5:00P.M. Friday (sleeping four consecutive nights on the premises is residing on the premises.) "A worker who resides on the employer's premises five consecutive nights from 9P.M. Monday to 9A.M. Saturday, sleeping four straight days on the premises is considered to reside." Fact Sheet 79*B* clarifies that the "work and sleep" language of Rule 2013 must be read in the *disjunctive*[12]: that is, work must be separate from sleeping as a prerequisite to the exemption's application. The District Judge apparently interpreted "work *and* sleep" as "working *while* sleeping" which is the exact *opposite* of the examples given in Fact Sheet 79B. Reversal should be required under these facts.

---

[12] The District Court read "and" as tantamount to "while" which is at direct odds with the examples given by the DOL in Fact Sheet 79B and other Regulations discussed herein. It appears clear that  the DOL never intended to include shift-work employees, who work while sleeping, in Rule 2013's third tier based on the examples given to clarify the Rule's application. This exemption and the DOL's examples never intended to include a night *shift* nanny within the exception's purview. Fact Sheet 79B discusses employees who remain on their employer's premises Monday- Friday; the employee in this appeal was a shift worker who never resided on her Employers' premises at all. She left each day after her shift ended and returned when her shift commenced the next day; she resided elsewhere in N. Miami and never even had a key to the Employers' premises. She brought an overnight bag when she arrived each shift and left with the same bag at her shift's conclusion.

Fact Sheet 79D[13] actually uses an example of a nanny who must watch over her charge even when she is sleeping, and deems the time sleeping as compensable work time. So, the first issue presented is: whether DOL Rule 2013 applies to a night-shift nanny who is employed to stay/sleep with an employers' very young children for 5 nights weekly and whose weekly shifts total 79 hours? Blanco urges this Court to answer this initial question in the *negative* for the reasons discussed above.

### iii.    Blanco's Sleep Time Does Not Qualify For Rule 2013's Criteria

" The FLSA was designed to protect workers "from 'the evil of overwork as well as underpay.' " *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (internal quotation marks omitted) (quoting *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 578, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942)). Section 785.23 advances that purpose by carefully distinguishing between "live-in" employees, who are essentially at home on the employer's premises, and nonresidential employees, who are not. And DOL's interpretation of that regulation, as we have construed it, provides a useful frame of reference -- the workweek -- to analyze that distinction." *Giguere v. Port Res. Inc.*, 927 F.3d 43, 50 (1st Cir. 2019).

"(a) Domestic service employees who reside in the household where they are employed are entitled to the same minimum wage as domestic service employees who work by the day. However, section 13(b)(21) provides an exemption from the Act's overtime requirements for domestic service employees who reside in the household where employed." ***29 C.F.R. § 552.102.***

Again, Blanco herein was a shift worker and, therefore, tantamount to "a domestic service employee who works by the day." She did not qualify for the

---

[13] Fact Sheet 79D issued in April 2016 *after* the DOL Rule 2013 was implemented.

subject exemption because she did not reside with her Employers. If this Court believes that "sleep time" is necessary to construe, even though it was *integral* to Blanco's primary job duty as a night-shift nanny, the Employers did not prove that Blanco is exempt pursuant the subject DOL Regulations and 29 USC 213(b)(21).

The Employers disavowed any detailed knowledge of what Blanco did at night while watching their small children. [ECF 104-1, P.7, L.6-13; P.19, L.20-P.20, L.20].

"Our Circuit does not hesitate to reverse orders improvidently granting summary judgment motions, and has noted that "even if a district court 'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.' " *Feliciano*, 707 F.3d at 1252 (citing *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)). Moreover, "as a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature." *Feliciano*, 707 F.3d at 1253. *Perez v. Fla. Beauty Flora, Inc.*, No. 20-21773-CIV, 2021 WL 1581925, at *12 (S.D. Fla. Mar. 24, 2021), report and recommendation adopted, No. 20-21773-CIV, 2021 WL 1579690 (S.D. Fla. Apr. 22, 2021).

Blanco's testimony was the *sole[14]* evidence that was presented as to what her "sleep time" *consisted of* [15]while employed by Employers. The District Court's initial order denying Blanco's Motion for Summary Judgment, ECF 82, omitted[16] the lion's share of Blanco's detailed deposition testimony which qualified her

---

[14] The Order on appeal, ECF 95 at P.2, states that Blanco's argument at the hearing to reconsider the Court's analysis of the exemption provision was unavailing as the Court did not invite Blanco do so. However, the Employers never moved for summary judgment; the Court did so for them. As a result of, Blanco never formally "responded" in a pleading to the latter. Instead, Blanco argued her position in opposition to summary judgment at the hearing which was her *only* opportunity to do so.

[15] The Order on Appeal ECF 95, cites several instances from record testimony relating to Blanco's concessions that she "slept" during her night shift with the Employers' young children and concludes that this testimony, along with Counsel's representations that Blanco "slept" at night with the Employers' children, estops Blanco from backtracking on her factual concession. ECF 95 at P.5. The fatal flaw with the District Court's reasoning in ECF 95 is that Blanco, at her deposition, described in detail what her "sleeping"-or lack thereof- consisted of. Her deposition testimony *preceded* all of the other "concessions" referenced in ECF 95; therefore, Blanco was *not* backtracking at all *nor* was she presenting prior inherently contradictory testimony. Blanco was the only one who knew what she ***did*** during her nighttime shift as the Employers' nanny. This overtime exemption is an affirmative defense that the *Employers* have the burden to prove. Blanco's position is that her detailed deposition testimony concerning her night-time job duties and sleep, at a minimum, creates an issue of material fact that a jury should decide- not the District Judge. That is, of course, *if* this Court determines that the subject FLSA exemption *can* apply to a night-shift nanny at all.

[16] Oddly, the District Court *failed* to cite significant references to Blanco's deposition testimony in its order denying Blanco's Summary Judgment Motion which the undersigned cited to at the hearing during the Court's sua-sponte Summary Judgment hearing. All of this "detailed" testimony was presented first the Court in the Facts in support of Blanco's Motion for Summary Judgment; it is *unusual* that the District Court virtually ignored it in its Order denying Blanco's Motion for Summary Judgment.

32

"sleep-time" while working as the Employers night-time nanny. For example, "These excerpts include details relating to what Blanco's nighttime responsibilities were: finishing her housekeeping tasks; giving a bottle to the baby at 1:00 am; changing one child's diaper; making sure the children were covered as they slept; lowering the music volume; calming one of the children down by giving her massages and water; remaining alert "to make sure that nothing would happen" so that the Parents could sleep; and attending to the girls who would awaken up to three or four times a night. [ECF 93-1, P.67, L.7–P.68, L.6; P.82, L.10–13] Other excerpts Blanco pointed to include her denials of ever sleeping at all while on shift. [ECF 93-1, P.68, L.7–10] (explaining "she did not sleep"); [ECF 93-1, P.70, L.18–19 ("I would not sleep. I would be in alert mode."); [ECF 93-1, P.70, L.25–P.71, L.2] ("always alert regarding the girls"); [ECF 93-1, P.73, L.21–23] (explaining the difference between sleeping, which she says would not do, and being "in a[n] alert stage or vigilant," as she says she was during her entire shift); [ECF 93-1, P.74, L.8–12] (insisting she would go twenty-seven hours without sleep, from Sunday mornings until Monday afternoons); [ECF 93-1, P.74, L.12 ("I never slept."); [ECF 93-1, P.104, L.19–20] ("I did not sleep. Where I would rest. Always alert.") According to Plaintiff, this testimony creates a genuine issue of material fact, defeating the entry of summary judgment in the Parents' favor…." *Blanco v. Samuel*, No. 21-24023-CIV, 2022 WL 5241893, at *2 (S.D. Fla. Oct. 6, 2022). Blanco further

stated at her deposition [ECF 93-1, P.67, L.5 - P.68, L.10], that one of the Employers' youngest children had "a lot of nervous problems at night. She would say that she had monsters in her bed. Very strong nights because the baby would wake me up because she would scream. She would scream a lot. She was nervous…." Blanco continued to explain that her job was remain in alert mode during the night to make sure that the children would be safe and so the parents could sleep. [ECF 93-1, P. 106, L.10 - P. 107, L.23]. Blanco stated that she doesn't say that she never slept as there were times that she entered into a sleep like state, but she was always alert regarding the girls. [ECF 93-1, P.70, L.16 - P.71 , L.2]. Blanco further explained in her deposition, " the words sleep and vigilant are two separate words. In a vigilant state, one could simply rest without falling asleep. Sleep is one— is when one sleeps in one's bed, resting, calm, without having to attend or see anything. That is sleep".  Based on that definition of sleep, Blanco maintained that she never slept while working for the Employers. [ECF 93-1, P.68, L. 1 to 12]. Blanco continued to explain in response to a question asking how often the girls would awaken at night, " "…..the girls—they have a problem with their nerves; many movies, many things that they see that are aggressive, and they awake, they are nervous, exhausted during the night….up for three or four times [per night]. The little ones that were in my room, up to three or four times….the little girl and the other [one], she is very frightened, very frightened. The other [girl], she likes movies

34

of things that are frightening." [ECF 93-1, P.82, L.3-19]. Blanco elaborated  more at her Deposition, [ECF 93-1, P.132, L.18 -P.134, L.10], " …they would ask for water. They would ask for their mother, many a time, and I would give the bottle to the little girl. The other [girl] would wake up on me…since she saw movies about dead people, she would always wake up and—being scared, and there was a shadow in her room. And, there was something bad in the room… the one that was with me, as well, she was always seeing monsters in her bed, and she would scream and she would yell desperately…. The house is small. Very small. You can hear everything, the doors, everything…."

The 2013 DOL Letter incorporates 29 C.F.R. 785.23 which, in turn, contemplates that a live-in employee "may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties where he or she may leave the premises for his or her own purposes." Blanco had no freedom to pursue any meaningful matter for her own purposes; the record on appeal is devoid of any evidence that would suggest otherwise. She was always with the Employers' young children and was always "on duty" whenever she was on the Employers' premises. The subject exemption cannot apply to bar her overtime wage claims. She was a shift-worker who resided outside of and did not even have a key to the Employers' residence; she did not receive her mail there either.

35

29 C.F.R. 785.23 states that an employee who resides on her employer's premises for an extended period of time, *not all* of the time is considered working time. In our case, Blanco simply does not fit this definition; *all* of the time that she spent on the Employers' premises *was* working time.

Blanco herein worked 14-hour shifts and all of her time is considered worktime and compensable pursuant to the following regulations:

"(b) Interruptions of sleep. If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted. For enforcement purposes, the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time." *29 C.F.R. § 785.22*

"An employee who is required to be on duty for less than 24 hours is working even though he is permitted to sleep or engage in other personal activities when not busy. A telephone operator, for example, who is required to be on duty for specified hours is working even though she is permitted to sleep when not busy answering calls. It makes no difference that she is furnished facilities for sleeping. Her time is given to her employer. She is required to be on duty and the time is worktime." *29 C.F.R. § 785.21.*

The District Court *incorrectly* interpreted 785.21 and 785.22 in concluding that: "Blanco's contrary approach is unavailing. That all her time on the premises—the 79 hours—was considered compensable time, even though she may not have been actually working, is not necessarily at odds with a finding that she resided on the property[17]. It simply means that she and the Parents agreed that she would be

---

[17] Yet another example of the District Court construing the subject exemption unfairly and narrowly in favor of the Employers.

compensated for all those hours—regardless of whether she was sleeping herself or tending to private matters, such as studying English, while the children slept. [ECF 93-1, P.70, L.16–21] (mentioning that she "would study English with Duolingo" while the children slept).) In other words, "tak[ing] into consideration all of the pertinent facts," 29 C.F.R. § 785.23, the parties here appear to have reached an agreement that, even though Blanco may not have been performing actual work for all 79 hours she was at the residence, she would, nonetheless be compensated for all those hours." _Blanco v. Samuel_, No. 21-24023-CIV, 2022 WL 3139189, at *5 (S.D. Fla. Aug. 5, 2022). These regulations _required_ that Blanco be paid for _all_ hours of her shifts which were all less than 24 hours and in which she enjoyed no meaningful time to pursue her own matters apart from the Employers' children. There is _no_ evidence of an agreement[18] between the Employers and Blanco that time spent pursuing her own personal matters would be compensated even though she was not actually working[19].    Therefore, the Summary Judgment orders on appeal are "_necessarily at odds" finding that she resided with the Employers._ A shift worker

---

[18] The District Court failed to apply these Regulations which require that shift work less than 24 hours be compensated and, instead, stood steadfastly by its overly narrow interpretation of DOL 2013's  "work and sleep" language in favor of the Employers. By doing so, the District Court unfairly read and applied the latter to exclude Blanco's overtime wage claims

[19] All of Blanco's time on the Employers' premises was compensable work time as per these Regulations; therefore, there was no voluntarily agreement to pay Blanco for the time that the Regulations _required_ that she be paid for.

cannot work 100% of the time, pursuant to these Regulations, and still "reside" on her employers' premises as that term is contemplated by 29 U.S.C. § 213(b)(21) and 29 C.F.R. Part 552, 78 FR 60,454, 60,474 (Oct. 1, 2013) ("2013 Final Rule"). The new decision in *Chao v. Jasmine Hall Care Homes, Inc*.,  highlights why the order on appeal must be reversed; Blanco <u>never</u> "resided" with the Employers and was never furnished her own private quarters to spend free time away from the Employers' many young children. "The issue is whether Defendants may invoke § 785.23 as an exemption to the FLSA's wage requirements for those employees who "reside" on their premises but who share a bedroom with other employees…. The DOL's 1988 Enforcement Policy clearly answers this question in the negative. It states that employees covered by the exemption in § 785.23 must reside in "private quarters" and "private quarters" means rooms that "are separate ... from any other staff members."

[The DOL's] 1988 Enforcement Policy is "entitled to controlling judicial deference" because it "constitutes an agency's interpretation of its own regulation to a particular industry and because it is long-standing, was developed after careful consideration, and was based on fundamental principles set forth in early landmark FLSA cases that 'sleep time' can be deducted by an employer, generally, only when the employee is provided with a 'home-like environment. "

…. The DOL's 1981 Letter interpreted § 785.23 to require "private quarters separate from the residents of the group home." The DOL's further clarification that "private quarters" means "separate ... from any other staff" is not inconsistent with the 1981 Letter; the first dictionary definitions of "private" are "[s]ecluded from the sight, presence, or intrusion of others" and "[d]esigned or intended for one's exclusive use." *The American Heritage Dictionary* (4th ed.2006).

Finally, § 785.23 requires that employees be able to engage in "private pursuits," and provides an example of such a pursuit. For the reasons stated, it is reasonable to interpret "reside" in § 785.23 to mean living alone in a private room." *Chao v. Jasmine Hall Care Homes, Inc.*, No. 205-CV-1306-GEB-KJM, 2007 WL 4591438, at *2–3 (E.D. Cal. Dec. 28, 2007). Since all of her time on the Employers' premises was "working time" and she did not enjoy meaningful periods to pursue her own personal matters apart from the Employers' children, her overtime claims cannot be exempted by 29 U.S.C. § 213(b)(21). This exemption requires that the Employer prove (3) elements to establish this affirmative defense: (1) "any employee who is employed in domestic service," (2) "in a household," and (3) "who resides in such household." 29 U.S.C. § 213(b)(21). The Employers cannot prove prong #3  and summary judgment should be reversed for finding that Blanco "resided" in the Employer's household. Application of the Fair Labor Standards Act to Domestic

Service, 29 C.F.R. Part 552, 78 FR 60,454, 60,474 (Oct. 1, 2013) ("2013 Final Rule") does *not* support a finding that Blanco "resided" with her Employers either.

> "For periods of free time (other than those relating to meals and sleeping) to be excluded from hours worked, the periods must be of sufficient duration to enable the employee to make effective use of the time. If the sleeping time, meal periods or other periods of free time are interrupted by a call to duty, the interruption must be counted as hours worked. See regulations part 785, § 785.23." *29 C.F.R. § 552.102*.

The applicable Regulations simply do not contemplate the exclusion of overtime pay to a night shift nanny who has no free time to herself apart from the employer's children.

### iv.    Not Only Did Blanco's Sleep Time *Not* Qualify For The Dol's 2013 Final Rule Overtime Exemption, But Blanco Was Never Provided A Separate Room By Employers.

The Regulations, discussed herein, and case law also appear to urge[20] that the subject employee be provided with a private room and facilities as a prerequisite to the exemption's application—neither of which exist in this case. Another example of the District Court's unfairly narrow construction of the subject exemption in the Employer's favor is found in DE 82.

---

[20] The Orders on appeal determined that the separate room requirement only applies to the compensability of time worked and is irrelevant to a determination of whether the domestic live-in exemption applies. Blanco believes that the relevant C.F.R. provisions cannot be read in a *vacuum* in order to construe the subject exemption narrowly in favor of the Employers. To read the exemption "fairly", a separate room may not be an absolute requirement but certainly is a highly relevant factor in determining whether Blanco "resided" with the Employers.

"At bottom, simply because some regulations and cases note that an employee who *does* have private quarters, in a home-like environment is considered to reside on an employer's premises, does not mean that an employee *must* have such private quarters in order to qualify as exempt from overtime." *Blanco v. Samuel*, No. 21-24023-CIV, 2022 WL 3139189, at *5 (S.D. Fla. Aug. 5, 2022).

Just as the District Court treated Blanco's "sleep time" as qualifying for the exemption by narrowly construing  "working *and* sleeping" as "working *while* sleeping" , the same error occurred by the District Court disregarding the fact that Blanco was not furnished a private room by the Employer. The District Court appears to have *strained* to fit Blanco within the exemption's purview in disregard for the Supreme Court's directive that FLSA overtime exemptions are to be give a *fair[21]* reading.

The lack of a private room, at a minimum, militates *against* a finding that this employee resided with her employer[22]. The District Court did not even take this into

----

[21] Oxford, based on a Google search, defines "fair" as impartial and just, without favoritism or discrimination.

[22] *Manrique v. Schoenbaum*, No. 1:09-CV-3212-SCJ, 2011 WL 13269434, at *5–7 (N.D. Ga. Aug. 12, 2011) (finding that domestic employee exemption applied because "Defendants/employer have shown that they provided the Plaintiff with a home-like environment with private quarters separate from the residents.) Also see *United States v. Sabhnani*, 599 F.3d 215 (2d Cir. 2010) (Criminal case analyzing 213(b)(21) exemptions in terms of restitution and finding victim maids had no other place to live other than perpetrators' residence and lived there for considerable periods of time and were exempt from overtime pay, ""To "reside" generally means "[t]o dwell permanently or for a considerable time; to have one's settled or usual abode; to live, in or at a particular place." *Oxford English Dictionary* (2d Ed.1989). In *Venturella,* we noted that the term "resides" in its normal use "denotes residence." *Venturella,* 391 F.3d at 125 (citing *Webster's Third New Int'l Dictionary* 1931 (2000). Cited by *United States v. Sabhnani,* supra.

account as a relevant factor before granting summary judgment to the employers.

As the First Circuit Appellate Court explained in _Giguere v. Port Res. Inc._:

"The FLSA's usual rule is that an employer must pay an employee for all time the employee is required to spend at a worksite, even sleep time. See 29 C.F.R. § 785.7 ("The workweek ordinarily includes 'all the time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed work place.' " _Giguere v. Port Res. Inc._, 927 F.3d 43, 47 (1st Cir. 2019)[23]

"Under circumstances where an employee does not maintain his or her permanent residence on the premises and does not otherwise reside on the premises 7 days a week, [DOL's Wage and Hour Division (WH)] will consider an employee who sleeps in private quarters, in a homelike environment, to reside on the premises for an extended period of time within the meaning of [section] 785.23 if the employee resides on the premises for a period of at least 120[24] hours in a workweek." _Giguere v. Port Res. Inc._, 927 F.3d 43, 48 (1st Cir. 2019).

---

[23] However, not all Circuits have adopted the 1st Circuit's definition of "residing on an employer's premises for extended period of time". _Watkins v. United Needs & Abilities, Inc._, No. CV RDB-20-0681, 2021 WL 2915265 (D. Md. July 12, 2021) ( discussing different Circuits' interpretations of residing on employer's premises".) However, even the other Circuits don't appear to consider a night-shift nanny of very young children to qualify for excluding sleep hours from pay when the main job duty was "to sleep/stay" next to the small children. Furthermore, there was no agreement between the Parties to exclude sleep time; even if one existed, it would be void since Blanco's shift was normally 14 hours from 7PM to 9am which required compensation by law as discussed above.

[24] In this case, there is no credible evidence that Blanco was on the Employers' premises for more than 79 hours weekly; even if such evidence did exist, Blanco was never given her own private room nor private bathroom which makes this provision completely inapplicable to Employee's work. See _Tahirou v. New Horizon Enterprises, LLC_, No. 3:20-CV-00281 (SVN), 2022 WL 510044, at *6 (D. Conn. Feb. 21, 2022)("….the Department of Labor regulations do not appear to permit such agreements for shifts of less than twenty-four hours, _compare_ 29 C.F.R. § 785.21 _with_ § 785.22, and accordingly the claimed agreement, even if proven, would not apply to Plaintiff 's weekday shifts."

Blanco, a night-shift nanny, spent far *less* than 120 hours weekly on her Employers' premises and was never furnished a separate private room. It stands to reason that she does not fit into the exemption's "reside with" requirement. Furthermore, staying in the same room with up to (4) young children can hardly be said to qualify as *a homelike environment* especially when Blanco did not enjoy *any* periods of free time by herself while working for the Employers. In additional to a "fair reading" requirement, the Employers have the burden to show by clear and affirmative evidence that an exemption applies. *Gregory v. First Title of Am., Inc.*, 555 F.3d 1300, 1302 (11th Cir. 2009) ("It is well established that the employer "bears the burden of proving the applicability of a FLSA exception by clear and affirmative evidence. " Reversal should be required accordingly.

The Legislative History relating to the 1974 amendments to the F.L.S.A and its exemptions appears to acknowledge that related Regulations addressing the term "to reside" should be considered when applying facts to the 213(b)(21) overtime exemption. "The committee is confident that appropriate methods to ensure compliance can be fashioned within the authority of the Secretary of Labor under the Act….. These provisions, coupled with the provision for an overtime exemption for live-in domestics, as provided in the bill, will serve to minimize any problems which might arise in the application of the law." 1974 U.S.C.C.A.N. 2811, 2845. The District Court refused to consider the absence of the "private room requirement"

in 29 U.S.C. 785.23 stating that "Blanco has conflated two different, albeit related, issues under the FLSA…" *Blanco v. Samuel*, No. 21-24023-CIV, 2022 WL 3139189, at *5 (S.D. Fla. Aug. 5, 2022). Blanco underscores the importance of considering related Regulations that address the definition of "to reside" in order to arrive at a *fair* interpretation and application of 29 U.S.C. § 213(b)(21) as required by the Supreme Court in *Encino Motorcars, LLC v. Navarro* (US S.Ct. 2018). Otherwise, an *unfair* application results in favor of the Employers as occurred herein.

### v.    Employers Were the Blanco's F.L.S.A. employers

The District Court improperly denied Blanco's motion for summary judgment on whether the Appellees were Blanco's F.L.S.A. employers and otherwise failed to consider relevant factors establishing the same.

"An employee is defined by the FLSA as an "individual employed by an employer." 29 U.S.C. § 203(e)(1). An employer includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 203(d). *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013)……

"To determine whether an individual falls into the category of covered 'employee'…….courts look to the 'economic reality' of the relationship between the alleged employee and alleged employer and whether that relationship demonstrates dependence." *Id.* (citing *Bartels v. Birmingham*, 332 U.S. 126, 130

(1947)). The Eleventh Circuit has identified six factors that guide courts in applying the economic reality test:

(1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

(2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

(3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;

(4) whether the service rendered requires a special skill;

(5) the degree of permanency and duration of the working relationship;

(6) the extent to which the service rendered is an integral part of the alleged employer's business. *Scantland*, 721 F.3d at 1312. However, the court recognized that "the overarching focus of the inquiry is economic dependence." *Id.* "[T]he final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of FLSA or are sufficiently independent to lie outside its ambit." *Id.* (quoting *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311–12 (5th Cir. 1976))." *Lange v. Tampa Food & Hosp., Inc.*, No. 8:19-CV-34-CEH-CPT, 2021 WL 678591, at *7 (M.D. Fla. Feb. 22, 2021).

45

The order [ECF 82] denying summary judgment on the employer/employee determination dedicates *less than* a half page to its analysis on this issue. The economic realities test is not mentioned at all; it concludes that there is a factual dispute as to whether the Employers were Blanco's employers. Blanco counters that there is no factual dispute to prevent judgment in her favor on this issue. The evidence is overwhelming that the Employers were Blanco's employers for the relevant time period and that she was economically dependent on them. Besides the undisputed facts that Finch paid Blanco directly for several months and issued her a W-2 Tax Form for 2019, Finch was controlling Blanco's work through Grace Trask/Amazing Grace LLC thereafter. Finch was on a group chat with the nannies supervising them when she wasn't home with them. The Employers hired and fired Blanco and Samuel even wrote her a detailed employment recommendation letter up her termination. Amazing Grace LLC paid Blanco the exact amount that Finch paid to the former.

The Employers, at ECF 52, P.15, "concede" that Amazing Gracie, LLC. was Blanco 's employer. Nobody has solicited this "concession". It is unknown how the Employers disclaim an employer/employee relationship with Blanco while also asserting the domestic employee overtime exemption which can *only* be claimed by

46

the direct employer of the subject employee[25]. Grace Trask was clear that her Company never employed Blanco. Finch suggested that Grace Trask open an agency like Isabella had done prior upon Finch's instructions. Grace did this as a favor to Finch and never made a financial profit: Amazing Gracie LLC was funded 100% with Finch's money and was a mere conduit for Finch to indirectly pay the Employee in order to avoid overtime pay and tax consequences. Finch paid Blanco directly over a multiple month period of time. Finch withheld employee taxes, S.S., FICA, etc. and issued Blanco a W-2 for the year 2019. The Employers exerted direct control over Blanco. They also controlled Blanco indirectly through their other nannies. Samuel's employment recommendation letter for Blamcp shows the control over her. Blanco was a full time nanny/housekeeper during 2019-2021 for the Employers. Finch knew the full time nanny/housekeeper's and the other nannies' particular job duties (such as who was responsible for giving the children dinner or bathing them) and Finch knew the hours Blanco worked. Finch spoke with Blanco about sleeping arrangements Finch made numerous payments directly to Blanco both before and

---

[25] "However, the DOL's "General Regulations" also define the statutory term "domestic service employment" as "services of a household nature performed by an employee in or about a private home ... *of the person by whom he or she is employed*." § 552.3." [emphasis added] <u>Long Island Care at Home, Ltd. v. Coke</u>, 551 U.S. 158, 158, 127 S. Ct. 2339, 2341, 168 L. Ed. 2d 54 (2007). 29 U.S.C. 213(b)(21) only can apply to any employee who is employed in domestic service…..

47

after Amazing Gracie LLC was already being utilized as the "middle man". Finch paid the nannies directly by personal check and disclosed the amounts paid to a payroll company – NannyChex, LLC – which made the payments to the taxing authorities and issued W-2s to the employees. Finch issued Blanco a W-2 Tax Form for 2019 only even though Blanco's job and work schedule was always 79 hours weekly from 2019-2021(August). Finch directly and, later through Amazing Grace LLC, always issued Blanco fixed amounts; there was no opportunity for Blanco to make a profit or loss. For part of the relevant time period,  Grace Trask paid Blanco the same pre-determined amount weekly that Blanco was paid directly by Finch prior. Finch then paid Blanco's wages to Grace Trask via  Amazing Grace LLC. Grace Trask did not determine how much to pay Blanco and had no authority to hire and fire Blanco or any of Employer Finch's nannies for that matter. Grace Trask said the nannies all worked as a team. Samuel participated in hiring, firing, and payment for Blanco. Samuel was almost always present in the home during Blanco's night shift and participated in the hiring decision or ratified same.  Samuel paid all other home expenses such as rent, electricity, water, and entertainment for children. Blanco had no special skills; she was a nanny for the relevant period; all of her work took place at the Employers' residence(s), therefore, she provided no meaningful

48

equipment[26] of her own to work for the Employers. Therefore, the summary judgment order should be reversed and a finding be made that the Employers were Blanco's FLSA employers from 2019-2021.

## Conclusion:

The summary judgment orders on appeal should be reversed. The domestic employee overtime exemption as contemplated by the DOL's final rule 2013 does not apply as a bar to Blanco's overtime claims because she never resided with the Employers and because there is, at least, a factual issue as to whether Blanco's sleep time qualifies for the exemption. Judgment should be entered finding the Employers were Blanco's employers under the F.L.S.A. from 2019-2021.

## Certificate Of Compliance

I hereby certify that 14 point Times New Roman font was used throughout this brief, and that 12,688, as counted by Microsoft Word, are extant herein after subtracting those sections excluded from the word count under Rule 32(f) and 11th Cir. R. 32-4.

---

[26] She brought her change of clothes for each night shift which she took with her when she left at the end of each shift.

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing was served via email and mail to Mark J. Beutler, Esq. at MJB@mjbpa.com, of The law Offices of Mark J. Beutler, 9400 South Dadeland Boulevard, Suite 600, Miami, FL 33156 on this 28th day of December 2022.

JH Zidell, Esq.
J.H. Zidell, P.A.
Attorney For Appellant/ Employee
300 71st Street, Suite 605
Miami Beach, Florida 33141
Tel: (305) 865-6766
Fax: (305) 865-7167

By:__/s/ JH Zidell_____
    JH Zidell, Esq.
    Florida Bar Number: 0010121