No. 22-13669

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

MARIA EUGENIA BLANCO,

Plaintiff-Appellant,

v.

ANAND ADRIAN SAMUEL,
LINDSEY ADAMS FINCH,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Southern District of Florida

_____

BRIEF FOR THE SECRETARY OF LABOR AS *AMICUS CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

_____

SEEMA NANDA
Solicitor of Labor

JENNIFER S. BRAND
Associate Solicitor

SARAH KAY MARCUS
Deputy Associate Solicitor

RACHEL GOLDBERG
Counsel for Appellate Litigation

MELISSA ANN MURPHY
Senior Attorney

KATELYN J. POE
Senior Attorney

U.S. Department of Labor
Office of the Solicitor
200 Constitution Avenue, N.W.
Room N-2716
Washington, D.C.  20210
(202) 693-5304
poe.katelyn@dol.gov

BLANCO v. SAMUEL, *et al*, Case No. 22-13669

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, counsel for the Secretary of Labor certifies

that she believes Appellant's Certificate of Interested Persons and Corporate

Disclosure Statement filed with this Court on December 28, 2022 is complete.

Date: February 1, 2023

/s/ Katelyn J. Poe
KATELYN J. POE

TABLE OF CONTENTS

Page(s)

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ................................................... C-1

TABLE OF CONTENTS ............................................................................. i

TABLE OF CITATIONS .......................................................................... iii

SECRETARY'S INTEREST AND AUTHORITY ....................................................1

ISSUES PRESENTED ...............................................................................3

STATEMENT OF THE CASE ......................................................................3

SUMMARY OF ARGUMENT .................................................................8

ARGUMENT ..........................................................................................9

I.  The District Court Erred in Concluding that Plaintiff is Exempt from the
FLSA's Overtime Requirements under the Live-In Domestic Service Employee
Exemption Because She Did Not Reside in Defendants' Home…9

   A. The Live-In Domestic Service Employee Exemption Applies Only to
   Employees that "Reside" on the Premises Permanently or for "Extended
   Periods of Time…………..……………................................................9

   B. Plaintiff Did Not "Reside" on Defendants' Premises within the Meaning
   of Section13(b)(21) …………………….....................................................17

II. Defendants were Plaintiff's Employers under the FLSA as a Matter of
   Economic Reality……………………………………………………..24

CONCLUSION ....................................................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

ADDENDUM A

*Reside*, Oxford Eng. Dictionary

ADDENDUM B

Interpretive Bull. No. 13: Hours Worked (Nov. 1940)

<u>TABLE OF CITATIONS</u>

Page(s)

<u>Cases:</u>

*Antenor v. D & S Farms*,
  88 F.3d 925 (11th Cir. 1996).................................................................. 24

*Encino Motorcars, LLC v. Navarro*,
  138 S. Ct. 1134 (2018) ......................................................................... 23

*Garcia-Celestino v. Ruiz Harvesting, Inc.*,
  843 F.3d 1276 (11th Cir. 2016).............................................................. 28

*Gelber v. Akal Security, Inc.*,
  14 F.4th 1279 (11th Cir. 2021) ............................................................. 23

*Klinedinst v. Swift Invs., Inc.*,
  260 F.3d 1251 (11th Cir. 2001).............................................................. 24

*Lamonica v. Hurricane Shutters, Inc.*,
  711 F.3d 1299 (11th Cir. 2013) ........................................................ .25-27

*Manrique v. Schoenbaum*,
  No. 19-cv-3212, 2011 WL 13269434 (N.D. Ga. Aug. 12, 2011)........................ 22

*Nationwide Mut. Ins. Co. v. Darden*,
  503 U.S. 318, 326 (1992) ...................................................................... 24

*New York v. Scalia*,
  490 F. Supp. 3d 748 (S.D.N.Y 2020)...................................................... 28

*Reich v. Dep't of Conservation & Nat. Res.*,
  28 F.3d 1076 (11th Cir. 1994)............................................................... 28

*Rodriguez v. Jones Boat Yard, Inc.*,
  435 F. App'x 885 (11th Cir. 2011) ..................................................... 26-27

*Romero v. Diaz-Fox*,
  No. 18-civ-21218, 2021 WL 3619677 (S.D. Fla. Aug. 16, 2021) ...................... 22

Page(s)

Cases (continued):

*Scantland v. Jeffry Knight, Inc.*,
   721 F.3d 1308 (11th Cir. 2013)............................................................ 28

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ........................................................................... 23

*Villarreal v. Woodham*,
   113 F.3d 202 (11th Cir. 1997)....................................................... 25, 27

Statutes:

Fair Labor Standards Act, 29 U.S.C. 201, *et seq.*:

   29 U.S.C. 202(a) .......................................................................... 1, 9
   29 U.S.C. 203(d)......................................................................... 25, 27
   29 U.S.C. 203(g)............................................................................... 24
   29 U.S.C. 204...................................................................................... 1
   29 U.S.C. 206(f).................................................................................. 9
   29 U.S.C. 207(l).................................................................................. 9
   29 U.S.C. 211...................................................................................... 1
   **29 U.S.C. 213(b)(21) .......................................................... 2 & Passim
   29 U.S.C. 216(c) ................................................................................ 1
   29 U.S.C. 217...................................................................................... 1

Fair Labor Standards Amendments Act of 1974,
   Pub. L. 93-259, 88 Stat. 55 (1974)................................................. 10, 11

Congressional Materials:

S.R. Rep. No. 93-690,
   Fair Labor Standards Amendments of 1974 (1974) ..................... 10, 11

Page(s)

Code of Federal Regulations:

**29 C.F.R. Part 552, Application of the Fair Labor Standards Act to Domestic Service

29 C.F.R. 552.102 ............................................................................2 & Passim
29 C.F.R. 552.109 ............................................................................ 11, 15, 27

29 C.F.R. Part 785, Hours Worked

29 C.F.R. 785.15 ........................................................................... 18
29 C.F.R. 785.21 ........................................................................... 19
**29 C.F.R. 785.23............................................................................2 & Passim

Department of Labor, Wage and Hour Division:

Enforcement Policy, Hours Worked in Residential Care (Group Home)
Establishments -- Sleep Time and Related Issues,
1988 WL 614199 (June 30, 1988) ....................................................... 14

Fact Sheet #79B, Live-in Domestic Service Workers Under the Fair Labor
Standards Act (FLSA), *available at*
https://www.dol.gov/agencies/whd/fact-sheets/79b-flsa-live-in-domestic-
workers........................................................................................... 21

Field Operations Handbook, Chapter 31, *available at*
https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-31
§ 31b20....................................................................................14

Interpretive Bulletin No. 13,
Hours Worked (Nov. 1940), Addendum B ................................................. 12, 18

WHD Opinion Letter WH-505,
1981 WL 179033 (Feb. 3, 1981)........................................................13 & Passim

Federal Rules of Appellate Procedure:

Federal Rule of Appellate Procedure 29(a)(2) ....................................................3

Page(s)

Additional Authorities:

**Application of the Fair Labor Standards Act to Domestic Service,
  78 Fed. Reg. 60,454 (Oct. 1, 2013)......................................................13 & Passim

Joint Employer Status Under the Fair Labor Standards Act,
  85 Fed. Reg. 2820 (January 16, 2020) ...........................................................27-28
  86 Fed. Reg. 40,939 (July 30, 2021)................................................................. 28

29 C.F.R. Part 785 (as of 1961),
  26 Fed. Reg. 190 (Jan. 11, 1961)........................................................................ 12

Brief for the Sec'y of Labor as Amicus Curiae,
  *Dep't of Labor v. Jasmine Hall Care Homes, Inc.*, 2008 WL 5010952
   (9th Cir. Sept. 25, 2008) ...................................................................................14

*Reside*, Oxford English Dictionary,
  Online (subscription), Addendum A (last visited Jan. 30, 2023) ................. 10, 17

No. 22-13669

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

MARIA EUGENIA BLANCO,

Plaintiff-Appellant,

v.

ANAND ADRIAN SAMUEL,
LINDSEY ADAMS FINCH,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Southern District of Florida
_____

BRIEF FOR THE SECRETARY OF LABOR AS *AMICUS CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL
_____

## SECRETARY'S INTEREST AND AUTHORITY

This appeal presents two issues arising under the Fair Labor Standards Act

("FLSA" or "the Act"). The Secretary of Labor ("Secretary") has a substantial

interest in the proper judicial interpretation of the FLSA because the Secretary

administers and enforces the Act. 29 U.S.C. 202(a), 204, 211(a), 216(c), 217. The

first issue is whether Plaintiff-Appellant was a live-in domestic service employee

exempt from the FLSA's overtime pay requirements under section 13(b)(21), 29

1

U.S.C. 213(b)(21), which turns on whether Plaintiff "resided" in Defendants-Appellees' home within the meaning of that exemption.  The Department of Labor ("Department") has promulgated regulations governing domestic service employment generally at 29 C.F.R. Part 552.  The Department's regulation at 29 C.F.R. 552.102, governing live-in domestic service employees, is at issue in this case.  That regulation cross-references another FLSA regulation, 29 C.F.R. 785.23, which concerns employees who reside on their employer's premises (and applies to any employee residing on their employer's premises, not just domestic service employees).  The district court's decision here ignored the plain language of the statute and misconstrued these regulations and the Department's guidance interpreting them to conclude, in error, that Plaintiff was a live-in domestic service employee because she worked five consecutive night shifts caring for the Defendants' children and was allowed to sleep while on shift.  The court's decision, if affirmed, would improperly exclude from the Act's overtime protections *any* domestic service employee who works five consecutive day or evening shifts under similar conditions.

The second issue is whether Defendants were Plaintiff's employers under the FLSA.  To determine whether an employment relationship exists under the Act, this Court examines the economic realities of the parties' relationship.  The district court, however, erroneously accepted Defendants' argument that they avoided an

employment relationship with a nanny caring for their children in their home simply by using an intermediary entity to pay the nanny.  This conclusion is contrary to the statute and this Court's precedent, and could create a significant loophole to deny FLSA protections to vulnerable workers.

The Secretary files this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2).

## ISSUES PRESENTED

1.  Whether a nanny who works five consecutive night shifts and is allowed to sleep while on duty "resides" in the employer's home and is therefore exempt from the FLSA's overtime requirements under section 13(b)(21).

2.  Whether individuals who, as a matter of economic reality, have an employment relationship with an employee can use an intermediary to circumvent their status as employers under the FLSA.

## STATEMENT OF THE CASE

A.    <u>Factual Background</u>[1]

1.  Plaintiff was employed as a full-time nanny to work in Defendants' home between January 2019 and August 2021, caring for Defendants' four young children.  District Ct. August 25, 2022 Order, Doc. 82, ("Order"), 1-2.  Plaintiff worked 79 hours each week, beginning with a 23-hour shift from Sunday at 10:00

---

[1] These facts are undisputed unless otherwise indicated.

a.m. until Monday at 9:00 a.m., followed by four consecutive 14-hour shifts

Monday through Thursday, from 7:00 p.m. until 9:00 a.m. the following day. *Id.*

Plaintiff earned between $800 and $880 per week. *Id.* She was paid only her

regular, hourly rate for all hours worked. *Id.*

2. Plaintiff performed childcare and housekeeping tasks at Defendants'

home, which sometimes required work late into the night, and included changing

diapers and feeding the baby in the middle of the night, and staying with and

tending to the children throughout the night. District Ct. Oct. 6, 2022 Order, Doc.

95 ("Order II"), 1-2.; Tr., Doc. 92, 8. Defendants instructed Plaintiff and

Defendants' other nannies generally on how to care for the children and what tasks

to perform, providing regular input through a group text chain. Pl.'s Facts, Doc. 47

("PF"), 10; Defs.' Facts, Doc. 54 ("DF"), 7. Defendant Samuel was at the home

with Plaintiff and the children most nights. DF, 7, 11-12.

3. Plaintiff did not have any private space at Defendants' home. Order, 1-2.

While on shift, Plaintiff stayed in the two youngest children's bedroom and used

the children's bathroom. *Id.* Plaintiff was permitted to sleep (or to study English)

during her shifts, waking to attend to the children as needed. Order II, 2. Plaintiff

did not keep any belongings at Defendants' home and brought a bag with a change

of clothes to and from each shift. Order, 2. Plaintiff left Defendants' home at the

end of each shift and lived with her aunt elsewhere. *Id*. Plaintiff did not have a key to Defendants' home. DF, 2.

4. Plaintiff was first hired as a part-time nanny in 2018. DF, 9, 11. Plaintiff alleges that Defendants hired her, while Defendants allege that an entity called Nannies with Love, run by one of Defendants' former nannies, hired Plaintiff. *Id*., 9. Defendants terminated their relationship with Nannies with Love in late 2018. *Id*., 11. After the split, Plaintiff continued working in Defendants' home. *Id*. When another of Defendants' nannies died unexpectedly in January 2019, Defendants decided to have Plaintiff take over that nanny's night shifts. PF, 9; DF, 11.

5. At first, Nannies with Love issued Plaintiff's paychecks. DF, 5, 9-11. After breaking with Nannies with Love in late 2018, Defendant Finch paid Plaintiff and the other nannies directly. *Id*., 9-11. Around this time, Defendant Samuel researched the FLSA's overtime requirements and determined that Plaintiff was not entitled to overtime compensation. *Id*. After approximately eight weeks, another of Defendants' nannies, Grace Trask, set up Amazing Gracie LLC ("the LLC"). Order, 2-3. From this point forward, the LLC issued Plaintiff's paychecks. *Id*.

6. Plaintiff alleges that Defendants continued to control her rate of pay after the LLC started issuing Plaintiff's paychecks, while Defendants assert that they

just paid one lump sum to the LLC and did not control how it was apportioned among the nannies.  Order, 2-3.  Defendants admit that they were the LLC's only client and its only source of funding, and that the LLC did not retain any profits.  *Id.*

7.  Defendants allege that the LLC was solely responsible for scheduling the nannies and all personnel policies; Plaintiff alleges that the LLC lacked any such authority.  Order, 2-3.  Defendants allege that they paid Ms. Trask for her services running the LLC; Plaintiff denies this.  *Id.*  Plaintiff alleges that Defendants instructed Ms. Trask to set up the LLC.  *Id.*  Though Defendants deny this, they admit that they sought to "outsourc[e] all aspects of the nanny operation" to the LLC.  *Id.*; DF, 12.

B.    Procedural Background and District Court Decisions

1.  In October 2021, Plaintiff filed an FLSA complaint against Defendants, alleging that Defendants willfully violated the FLSA's overtime requirements.  Compl., Doc. 1, 4.  On April 29, 2022, Plaintiff moved for summary judgment on two issues relevant to this appeal—her entitlement to overtime compensation under the FLSA and Defendants' status as Plaintiff's employers.  Pl.'s Mot. Summ. J., Doc. 45, 1.  Defendants opposed, arguing that Plaintiff was exempt from overtime pay under section 13(b)(21) and that the LLC was Plaintiff's sole employer.  Defs.' Opp., Doc. 52, 1-3.

2.  On August 5, 2022, the district court denied Plaintiff's motion for summary judgment.  Order, 1.  In addressing whether the section 13(b)(21) exemption applied to Plaintiff, the court relied almost exclusively on isolated language in the preamble to a 2013 Department final rule amending the domestic service regulations to conclude that Plaintiff resided at Defendants' home and therefore was exempt from overtime under section 13(b)(21).  *Id.*, 4-9.  The court reasoned that an employee "resides" on the employer's premises under the exemption when the employee works "fewer than 120 hours per week, working and sleeping on the employer's premises for five consecutive days or nights."  *Id.*, 7.  Finding that the record demonstrated that Plaintiff worked fewer than 120 hours per week and spent five consecutive nights "working and sleeping" at Defendants' home, the court concluded that Plaintiff had failed to demonstrate she was entitled to overtime.  *Id.*, 7-9.  The court further concluded that Plaintiff failed to present facts to establish that Defendants were her employers, and also that the facts Defendants cited, if true, would demonstrate that the LLC was Plaintiff's sole employer.  *Id.*, 9-11.

3.  After hearing argument, the court entered summary judgment for Defendants on October 6, 2022, holding that Plaintiff was exempt from the FLSA's overtime requirements for the same reasons as set forth in the court's August decision.  Order II, 1-4.

## SUMMARY OF ARGUMENT

Since 1974, domestic service employees such as nannies have been explicitly covered under the FLSA.  The FLSA provides an exemption from the Act's overtime pay requirements for domestic service employees who "reside" in the household in which they work.  Under the plain language of the statute, as well as the FLSA's legislative history and the Department's regulations and guidance, whether an employee "resides" on the premises within the meaning of the exemption depends on multiple facts, such as the amount of time spent on the employer's premises, whether the employee has periods of both on- and off-duty time, and whether the employee has appropriate space in which to spend off-duty time.  This inquiry does *not*, as the district court concluded, turn simply on whether the employee is allowed to sleep during work time or whether the employee works five consecutive shifts.  The undisputed facts here demonstrate that Plaintiff did not "reside" at Defendants' home within the meaning of this exemption.  The district court erred in concluding otherwise.

In addition, the FLSA's overtime requirements apply only to "employer[s]."  The statute defines the term "employer" broadly.  This Court examines the economic realities of the parties' relationship to consider whether an individual or entity is an "employer" of an employee under the Act.  Here, the facts as presented by Defendants themselves demonstrate that Defendants were Plaintiff's employers

as a matter of economic reality, even though Defendants elected to pay Plaintiff through an LLC. Defendants may not delegate away their responsibilities as employers to an intermediary, and the district court's seeming acceptance of their attempt to do so was in error.

## ARGUMENT

**III. THE DISTRICT COURT ERRED IN CONCLUDING THAT PLAINTIFF IS EXEMPT FROM THE FLSA'S OVERTIME REQUIREMENTS UNDER THE LIVE-IN DOMESTIC SERVICE EMPLOYEE EXEMPTION BECAUSE SHE DID NOT RESIDE IN DEFENDANTS' HOME.**

A.   The Live-In Domestic Service Employee Exemption Applies Only to Employees who "Reside" on the Premises Permanently or for "Extended Periods of Time."

1. The FLSA generally requires that domestic service employees be paid at least the minimum wage for all hours worked and one and one-half times the employee's regular rate of pay for all overtime hours worked. 29 U.S.C. 202(a), 206(f), 207(l). The Act contains an exemption from overtime compensation for "any employee who is employed in domestic service in a household and who resides in such household." *Id.* 213(b)(21). This issue here is whether Plaintiff "reside[d]" in Defendants' household within the meaning of section 13(b)(21).

Neither the Act nor the Department's regulations explicitly define the term "reside." As commonly used, the term "reside" means "[t]o dwell permanently or for a considerable time, to have one's settled or usual home in or at a particular

9

place." Oxford Eng. Dictionary (Dec. 2022) (online version), Addendum A; *see* Am. Heritage Dictionary (2022) (online version) (defining "reside" as "[t]o live in a place permanently or for an extended period"). Both the FLSA's legislative history regarding the exemption and the Department's longstanding regulations and guidance are consistent with and apply this commonly understood meaning of "reside." These authorities contemplate an employee who "resides" on the employer's premises as one who enjoys periods of time off duty while there—in other words, who "settles" or "dwells" there—and not one who is simply working at all times.

2. In 1974, Congress explicitly extended FLSA coverage to domestic service employees employed in private households. Fair Lab. Standards Amends. Act of 1974, Pub. L. 93-259 § 7, 88 Stat. 55, 62 (1974). However, Congress was cognizant of the "difficult[y]" of determining actual hours worked for "a domestic service employee [who] resides on the employer's premises" because "[o]rdinarily such an employee engages in normal private pursuits such as eating, sleeping, and entertaining, and has other periods of complete freedom." S.R. Rep. No. 93-690, at 20-21 (1974). To alleviate these concerns, Congress noted that the Department's existing regulation at 29 C.F.R. 785.23, which (then and still) permits reasonable agreements for compensable hours worked for employees who "reside" on their employer's premises permanently or "for extended periods of

10

time," would apply to live-in domestic service employees. S.R. Rep. No. 93-690, at 20-21. To further alleviate these concerns, Congress also enacted the overtime exemption at section 13(b)(21) for "any employee who is employed in domestic service in a household and who resides in such household." § 7(B)(4), 88 Stat 55, 62; S. Rep. No. 93-690, at 20-21.

Pursuant to its congressionally delegated authority, the Department has issued regulations governing domestic service employment at 29 C.F.R. Part 552. As relevant here, section 552.102 specifically addresses "[d]omestic service employees who reside in the household where they are employed." 29 C.F.R. 552.102.[2] The regulation reflects that such employees will have, in addition to on-duty time, "sleeping time, meal time and other periods of complete freedom from all duties when the employee may either leave the premises or stay on the premises for purely personal pursuits[,]" and allows that "the employee and the employer may exclude, by agreement between themselves," such periods of time from the employee's hours worked. *Id.* Section 552.102 explicitly cross-references 29 C.F.R. 785.23.

3. Section 785.23, which concerns compensable hours worked for all employees residing on their employer's premises, in turn provides:

---

[2] 29 C.F.R. 552.109(c) provides that a family or individual that employs or jointly employs a live-in domestic service employee may claim the live-in exemption, but third-party employers may not.

> An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted.

29 C.F.R. 785.23.

The Department first issued the interpretation now found at 29 C.F.R. 785.23 in 1940. Dep't of Lab., Wage & Hour Div., "Interpretive Bull. No. 13: Hours Worked" (Nov. 1940) ("IB No. 13"), Addendum B, 5. As the Department explained, such guidance was needed because, "in the ordinary course of events," the employee will have a "normal night's sleep, . . . ample time in which to eat [ ] meals, and . . . a certain amount of time for relaxation and entirely private pursuits" and thus will not be "necessarily working" at all times on the employer's premises. *Id*. Thus, the basic tenet underpinning the Department's longstanding guidance for live-in employees, both within and beyond domestic service, is the understanding that such employees will have periods of on-duty and off-duty time while residing on the employer's premises, during the latter of which the employee may engage in purely private pursuits. The Department reiterated these principles in 1961 when it revised and recodified the guidance in IB No. 13 in the Code of Federal Regulations. 26 Fed. Reg. 190, 193 (Jan. 11, 1961) (codified at 29 C.F.R. 785.23).

12

4.  Since then, the Department has issued extensive guidance under 29 C.F.R. 785.23 interpreting "resides . . . for extended periods of time" that applies the commonly understood meaning of the term "reside."[3]  In a 1981 Opinion Letter, for example, the Department's Wage and Hour Division ("WHD") explained that a group-home residential-care employee who maintained a separate residence may still qualify as an employee who "resides" on the employer's premises for an "extended period of time" within the meaning of section 785.23 as long as "the facilities offered by the employer provide a home-like environment with private quarters separate from the residents of the group home," and the employee resides on the employer's premises for most of the week—five consecutive days or nights.  WHD Opinion Letter WH-505, 1981 WL 179033, at *1-2 (Feb. 3, 1981) ("1981 Opinion Letter").  The letter provided a number of examples to illustrate this point:

> [E]mployees who are on duty from 9 a.m. Monday until 5 p.m. Friday would also be considered to reside on the employer's premises.  Even though on duty for less than 120 hours, they are on duty for five consecutive days (Monday through Friday).  The fact that they sleep over only four nights does not alter this conclusion.  Similarly, employees who are on duty from 9 p.m. Monday until 9 a.m. Saturday would also be considered to reside on their employer's premises since they are on duty for five consecutive nights (Monday night through Friday night).

---

[3] Neither party alleges that Plaintiff resided in Defendants' home on "a permanent basis."  29 C.F.R. 785.23.

*Id.* at *2.  "In light of the amount of time" such employees spend at the group home, WHD explained, "it is in effect a second residence."  *Id*. at *1.  Also in 1981, WHD revised its Field Operation Handbook ("FOH") to comport with the 1981 Opinion Letter, reiterating the examples included in that letter.  FOH § 31b20.[4]

In 1988, WHD issue an Enforcement Policy reiterating and expanding on the guidance in the 1981 Opinion Letter, explaining "[WHD] will consider an employee who sleeps in private quarters, in a homelike environment, to reside on the premises for an extended period of time within the meaning of [29 C.F.R.] 785.23 if the employee resides on the premises for a period of at least 120 hours in a workweek," and defining "private quarters" to mean "living quarters" in which, among other requirements, "the employee is able to leave his or her belongings during on- and off-duty periods."  1988 WL 614199, at *2 (June 30, 1988).  *See* Br. of Sec'y of Labor, *Dep't of Labor v. Jasmine Hall Care Homes, Inc.*, 2008 WL 5010952 (9th Cir. Sept. 25, 2008) (section 785.23 available only where residential care employer provides home-like environment with private quarters, which includes bedrooms separate from co-workers and residents).

---

[4] Available at https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-31.

In 2013, the Department engaged in rulemaking pursuant to delegated congressional authorization to revise its domestic service employee regulations at 29 C.F.R. Part 552. "Application of the [FLSA] to Domestic Service," 78 Fed. Reg. 60,454 (Oct. 1, 2013) ("2013 Final Rule"). The rule provided, among other things, that third-party employers may not claim section 13(b)(21)'s live-in domestic service employee exemption. *Id.* at 60,557; *see* 29 C.F.R. 552.109(c). In the preamble section, the Department made clear that it "did not propose any changes to the definition of live-in domestic service employee or otherwise discuss the requirements for meeting the live-in domestic service exemption." 78 Fed. Reg. at 60,474. The Department stated its "intention to continue to apply its existing definition of live-in domestic service employees." *Id.* The Department nonetheless discussed its longstanding regulations and guidance surrounding the live-in exemption in response to comments received on the third-party employer proposal. *Id.*

Citing to both 29 C.F.R. 785.23 and the FOH, the preamble to the 2013 Final Rule reiterated that an employee will be considered a live-in domestic service employee under section 552.102 if the employee "(1) [m]eets the definition of domestic service employment under § 552.3 and provides services in a 'private home' pursuant to § 552.101; and (2) resides on his or her employer's premises on a 'permanent basis' or for 'extended periods of time.'" 78 Fed. Reg. at 60,474.

15

The Department included in the preamble a near-replication of language in prior

guidance:

> If less than 120 hours per week is spent working and sleeping on the
> employer's premises, five consecutive days or nights would also qualify as
> residing on the premises for extended periods of time.  For example,
> employees who reside on the employer's premises five consecutive days
> from 9:00 a.m. Monday until 5:00 p.m. Friday (sleeping four straight nights
> on the premises) would be considered to reside on the employer's premises
> for an extended period of time.  Similarly, employees who reside on an
> employer's premises five consecutive nights from 9:00 p.m. Monday until
> 9:00 a.m. Saturday would also be considered to reside on their employer's
> premises for an extended period of time.

*Id*. (citations omitted).  The Department also emphasized the statutory requirement

that a live-in employee must actually *reside* in the household.  *Id*.

5.  As all of the above guidance reflects, the determination of whether an

employee "resides" on the employer's premises within the meaning of section

13(b)(21) requires a common sense examination of all of the relevant facts, such as

the amount of time spent on the employer's premises; whether the employee has

periods of off-duty time in which to eat, sleep, and pursue private pursuits; and

whether the employee is given appropriate quarters in which to spend such time.

This examination does not turn simply on whether the employee works five

consecutive shifts, during which shifts she may sleep.

B.    <u>Plaintiff Did Not "Reside" on Defendants' Premises within the Meaning of Section 13(b)(21).</u>

Applying the plain language of the statute and the Department's longstanding regulations and guidance to the undisputed facts demonstrates that Plaintiff did not reside in Defendants' home as required under section 13(b)(21).

1.  Plaintiff did not "reside" at Defendants' home within the commonly applied meaning of that term.  She did not have a "settled or usual home in or at" Defendants' home, nor "dwell" there.  Oxford Eng. Dictionary (emphases omitted), Addendum A.  Plaintiff did not have her own space in the home and brought her personal effects with her to use at the beginning and end of each shift.  Order, 1-2.  She shared a room and bathroom with Defendants' young children.  *Id.*[5]

Significantly, Plaintiff did spend any leisure or off-duty time at Defendants' home.  As discussed above, the regulations at 29 C.F.R. 552.102 and 785.23 contemplate an employee spending time performing work and additionally spending non-work time sleeping, eating meals, and enjoying leisure hours at the

---

[5] While the provision of private quarters is not strictly required for the live-in exemption to apply, whether such quarters are provided is still a relevant consideration.  *See* 29 C.F.R. 552.102 (cross-referencing section 785.23); 1988 Enforcement Policy (interpreting section 785.23's provision for an employee residing for an "extended period of time" as requiring that the employee have private quarters, in a home-like environment, in which to spend off-duty time); 1981 Opinion Letter (same).

employer's premises in order to be "resid[ing]" there. Indeed, these are the circumstances giving rise to the need for the live-in exemption in the first place. *See, e.g.,* S.R. 98-390, at 18. But this is plainly not what occurred here. Plaintiff arrived at the beginning of her set shift and left as soon as that shift ended, living elsewhere with her aunt. Order, 2. There is no evidence that Plaintiff was ever completely relieved from duty to pursue private pursuits at Defendants' residence, nor spent any leisure time there whatsoever. *Id*. Plaintiff did not have a key, curtailing any ability to come and go freely during any off-duty time as contemplated under the regulations. DF, 2. Nor did Plaintiff have any off-duty time at Defendants' home in which to get a "normal night's sleep." IB No. 13, 5.

There is no question that Plaintiff was *working* at all times while on the premises, even when sleeping, despite the district court's erroneous assertion that Plaintiff "may not have been actually working" for all 79 hours she was at Defendants' home. Order, 1, 7-8. It is undisputed that Plaintiff was required to be on the premises, with the children, for the entirety of her shifts. *Id*. Even if the children or Plaintiff were sleeping, she was "engaged to wait" in that she was required to be available to respond to the children should they wake or need something throughout the night— "waiting [was] an integral part of the job"—and therefore these were compensable hours worked. 29 C.F.R. 785.15 ("on duty" regulation explaining that such waiting time "belongs to and is controlled by the

employer"); *see* 29 C.F.R. 785.21 (when an employee is required to work a shift of less than 24 hours (as here), all time on shift is compensable hours worked, even if the employee is permitted to sleep or engage in other personal activities when not busy). Accordingly, that Plaintiff was permitted to sleep while on duty, i.e., while engaged to wait, does not establish that Plaintiff resided in Defendants' home.

2. The district court erroneously dismissed the relevance of the statute's plain language and the Department's longstanding regulations and guidance, relying instead on a misreading of preamble language from the 2013 Final Rule, which did not amend the regulations at 29 C.F.R. 552.102 or 785.23. Order, 6-9. However, the Department reiterated in the preamble its longstanding guidance regarding the meaning of "reside . . . for extended periods of time" under these regulations. 78 Fed. Reg. at 60,474. That discussion plainly contemplated that an employee who "resides" on the employer's premises will have periods of on-duty time, as well as off-duty time in which to pursue personal pursuits, such as sleeping. *Id*. The Department further explained that a domestic service employee "resides" in the household for purposes of the live-in domestic service employee exemption "[i]f less than 120 hours per week is spent working and sleeping on the employer's premises, five consecutive days or nights." *Id*.

The district court viewed this sentence, in isolation, to constitute a "rule" setting forth a "straight forward definition of 'reside'" under which an employee

19

who "(1) works fewer than 120 hours per week; and (2) both works and sleeps on the employer's premises; (3) for five consecutive days *or* nights . . . reside[s] on the premises for an extended period and to thus fall[s] under the overtime exemption." Order, 7, 9. This approach is flawed.

First, the district court interpreted the phrase "working and sleeping" to mean effectively "sleeping *while* working," resulting in the court's almost singular focus on whether Plaintiff slept while at Defendants' home. Order, 7; Order II, 3-5. In context, however, the use of the phrase "working and sleeping" in the preamble is, consistent with the statute, referring to an employee who actually resides on the premises for the workweek, both working and sleeping *at different times*. Nothing in this sentence, nor anywhere in the preamble to the 2013 Final Rule or the Department's other guidance, suggests that time in which an employee is on duty but permitted to sleep converts that employee into a live-in employee.

The two examples that immediately follow the "working and sleeping" language in the preamble (which originated in the 1981 Opinion Letter) further bear this out, though the district court ignored their import. These examples—in which an employee resides on the premises from early Monday morning until the end of the day on Friday for 104 hours, or from Monday evening until Saturday morning for 108 hours—clearly contemplate an employee residing at the employer's premises for the workweek and sleeping when off-duty, not that an

employee happens to complete five defined shifts in a row during which she may sleep, as occurred here.[6]

Second, the district court erred in interpreting the use of the disjunctive in describing "five consecutive days or nights" to "unambiguously" encompass an employee who works five consecutive night shifts, regardless of where the employee spends their off-duty time. Order, 7. This language, and the pertinent examples, originally appeared in the 1981 Opinion Letter to address whether 29 C.F.R. 785.23 could be applied to workers in group residential homes. 1981 WL 179033, at *2. Such workers often begin their workweeks in the evenings; similarly, home care workers (the focus of the 2013 Final Rule in which those examples were repeated) also often begin their workweeks in the evening due to staffing needs. Accordingly, the first example—early Monday morning until the end of the day on Friday—is of five consecutive days, but only four nights. The second example—Monday evening until Saturday morning—is of five consecutive

---

[6] In 2013 the Department issued WHD Fact Sheet 79B, "Live-in Domestic Service Workers Under the Fair Labor Standards Act (FLSA)" (Sept. 2013), *available at* https://www.dol.gov/agencies/whd/fact-sheets/79b-flsa-live-in-domestic-workers. This fact sheet—upon which Defendants allege they relied in determining that Plaintiff was exempt from overtime, DF, 10—provides even further context to these examples, explaining that "[a]worker who resides on the employer's premises five consecutive nights from 9:00 p.m. Monday until 9:00 a.m. Saturday (*sleeping four straight days on the premises*) is considered to reside on the employer's premises for an extended period of time." (Emphasis added). These examples make plain that the exemption encompasses a night-shift worker who then sleeps during the day (when off duty) at the premises.

nights, but only four days. Thus, the disjunctive "days or nights" language simply reflects that residing on an employer's premises for an extended period of time can consist of five consecutive days even if it is only four consecutive nights, and vice versa. It does not encompass an employee who simply works five consecutive day- or night-shifts, arriving at the beginning of each shift and departing the premises at the end of each shift.

Finally, all of the cases cited by the district court for support in applying its formulaic "criteria" are inapposite to the facts here. Order, 6. Even if these cases purported to apply a three-part test based on the preamble the 2013 Final Rule, none involved a worker who stayed on the premises only for their predetermined shifts and were found to qualify for the live-in exemption. *See, e.g., Romero v. Diaz-Fox*, No. 18-civ-21218, 2021 WL 3619677, at *5 (S.D. Fla. Aug. 16, 2021) (not applying exemption to shift worker); *Manrique v. Schoenbaum*, No. 19-cv-3212, 2011 WL 13269434, at *7 (N.D. Ga. Aug. 12, 2011) (applying exemption where nanny "dwelled for a considerable time" at defendants' residence, had private quarters in home-like environment, and produced employment contract referencing residential arrangement).

In sum, the court's reading of the 2013 Final Rule's preamble takes one sentence out of context, such that the court lost sight of the most important statutory element of the exemption—that the employee *reside* on the employer's

premises.  The district court's approach, if adopted by this Court, would exclude

from the Act's overtime protections any domestic service employee who works

five consecutive shifts—whether day or night—and sleeps during that shift, e.g., a

day-shift nanny who works Monday through Friday and is permitted to nap while

the children she cares for sleeps, or a night-shift home health aide who works five

consecutive nights and occasionally sleeps while the individual he cares for sleeps.

This result is plainly inconsistent with the statute and the Department's

longstanding regulations and guidance implementing the exemption.[7]  Instead,

when considering the statutory text and the totality of the Department's regulations

and guidance, the undisputed facts here demonstrate that Plaintiff did not reside at

Defendants' home as required under section 13(b)(21).[8]

---

[7] The district court did not cite to the Supreme Court's decision in *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018), in its orders.  To the extent the parties and this Court find *Encino* relevant to consideration of this appeal, the Department's position in this case is entirely consistent with a fair reading of section 13(b)(21), as required by *Encino*.

[8] The Department's interpretations of the FLSA in its part 785 regulations and related sub-regulatory guidance, as well as an amicus brief, should be given deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (Department's rulings, interpretations, and opinions, "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control"); *see also Gelber v. Akal Sec., Inc.*, 14 F.4th 1279, 1281 & n.1 (11th Cir. 2021) (FLSA interpretive regulations in

## IV. DEFENDANTS WERE PLAINTIFF'S EMPLOYERS UNDER THE FLSA AS A MATTER OF ECONOMIC REALITY.

The district court further erred in concluding that Plaintiff failed to demonstrate that Defendants were her employers.  In its August decision, the court concluded that Plaintiff failed to present facts to establish an employment relationship between Defendants and Plaintiff, and that the facts Defendants cited, if true, would show that the LLC was Plaintiff's employer and Defendants were not joint employers along with the LLC.  Order, 9-11.  These conclusions were in error, particularly as they reflect the court's seeming acceptance of Defendants' underlying premise that they can negate the existence of an employment relationship by delegating certain tasks to the LLC.

1.  The FLSA defines "employ" and "employer" with "striking breadth." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).  "'[E]mploy' includes to suffer or permit to work."  29 U.S.C. 203(g); *see Antenor v. D & S Farms*, 88 F.3d 925, 929 n.5 (11th Cir. 1996) ("The 'suffer or permit to work' standard derives from state child-labor laws designed to reach businesses that used middlemen to illegally hire and supervise children.").  "'[E]mployer' includes any

---

29 C.F.R. Part 785 concerning hours worked "are entitled to *Skidmore* deference") (citing *Skidmore*, 323 U.S. at 140); *Klinedinst v. Swift Invs., Inc.*, 260 F.3d 1251, 1255 (11th Cir. 2001) (finding WHD's FOH "persuasive").

person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. 203(d).

To determine whether an entity or individual fits within the definition of "employer," this Court looks at the "economic reality" of the relationship between the parties, considering factors such as whether the alleged employer determined the rate and method of payment, had the power to hire and fire the employee, supervised and controlled the employee's work schedule or conditions of employment, or maintained employment records. *Villarreal v. Woodham*, 113 F.3d 202, 205 (11th Cir. 1997).

Following from the broad definition of "employer," this Court recognizes that multiple individuals or entities may be treated as an "employer" of an employee, and that paying an employee through a corporate form does not circumvent an otherwise existing employment relationship with the employee. In *Lamonica v. Safe Hurricane Shutters, Inc.*, for example, this Court recognized that it is appropriate "to impose liability [under the FLSA] upon those [individuals] who control a corporation's financial affairs and can cause the corporation to compensate (or not to compensate) employees." 711 F.3d 1299, 1313 (11th Cir. 2013) (internal quotation marks omitted).

2. Applying these standards here, the facts put forth by Defendants themselves demonstrate that Defendants were Plaintiff's employers under the Act.

25

First, Defendants exercised significant control over Plaintiff's rate and method of payment, including the lack of overtime compensation. *Lamonica*, 711 F.3d at 1314.  Although the LLC generally issued Plaintiff's paychecks, it is undisputed that the LLC was entirely funded by Defendants and that it had no other clients. Order, 2-3.  The LLC did not retain any profits.  *Id*.  Moreover, Defendants admit that they researched the FLSA's overtime requirements and determined that Plaintiff was exempt.  DF, 10.  This determination, as well as Plaintiff's rate of pay generally, were in place well before the initiation of the LLC.  *Id.*, 10-11. Moreover, for a time before the "arrange[ment]" of the LLC, Defendants paid Plaintiff directly until Defendants could "delegate[e]" this task to the LLC.  *Id*., 11-12.

Second, Defendants had authority to hire and fire Plaintiff.  *Cf. Rodriguez v. Jones Boat Yard, Inc.*, 435 F. App'x 885, 886-88 (11th Cir. 2011) (live-in caregiver for elderly women was not employed by son and son's company even though company paid caregiver because neither son nor company hired or fired caregiver).  Defendants argue that Nannies with Love first hired Plaintiff.  DF, 3. However, it is undisputed that Plaintiff continued to work in Defendants' home even after Defendants terminated their working relationship with Nannies with Love.  *Id*., 7; PF, 9.

Third, Defendants controlled Plaintiff's work schedule and conditions of employment. *Lamonica*, 711 F.3d at 1314. After one of Defendants' other nannies died unexpectedly, Defendants decided that Plaintiff would take over her night shifts. PF, 9; DF, 7. Defendants also told the nannies how to care for the children and what tasks to perform, providing regular input through a group text chain. PF, 10; DF, 7, 12. Defendant Samuel was at the home with Plaintiff and the children most nights. DF, 3. Plaintiff cared for Defendants' children, in Defendants' home. Order, 1; *Cf. Rodriguez*, 435 F. App'x at 886-88 (neither son nor son's company were caregiver's employer where no indication that they controlled caregiver's schedule or caregiving duties). Thus, Defendants exercised significant control over the day-to-day aspects of Plaintiff's employment, even if Defendants allegedly did not specify which particular nanny should perform which exact task (e.g., giving the children a bath or feeding them). *Lamonica*, 711 F.3d at 1313-14.

The totality of these facts demonstrates that as a matter of "economic reality," *Villarreal*, 113 F.3d at 205, Defendants were "acting directly or indirectly in the interest of an employer in relation to" Plaintiff, 29 U.S.C. 203(d).[9]

---

[9] Notably, Defendants' primary argument below was assertion of the live-in domestic service employee exemption, which is available only to individuals or families that employ the worker. 29 C.F.R. 552.109(c).

3.  In the alternative, these same facts demonstrate that Defendants were Plaintiff's joint employers with the LLC as a matter of economic reality.  *Garcia-Celestino v. Ruiz Harvesting, Inc.*, 843 F.3d 1276, 1294 (11th Cir. 2016) (discussing considerations relevant to examining whether, as a matter of economic reality, employee is economically dependent on alleged joint employer).[10] Defendants cannot contract away or "outsource" their employment relationship with Plaintiff to the LLC.  DF, 12.  It is well established that employers may not delegate away their responsibilities under the Act.  *Reich v. Dep't of Conservation & Nat. Res.*, 28 F.3d 1076, 1083 (11th Cir. 1994); *see Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013) (employment relationship "is not governed by the 'label' put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether the work done, in its essence, follows the usual path of an employee") (internal quotation marks omitted).

Accordingly, the district court erred in concluding that Plaintiff failed to establish that Defendants were her employers.

---

[10] In their opposition to summary judgment, Defendants referenced the Department's rule, "Joint Employer Status Under the [FLSA]," 85 Fed. Reg. 2820 (January 16, 2020).  However, after a district court vacated that rule as contrary to law, *New York v. Scalia*, 490 F. Supp. 3d 748, 795 (S.D.N.Y 2020), the Department rescinded it, 86 Fed. Reg. 40,939 (July 30, 2021).  Therefore, the rule should not be relied upon.

CONCLUSION

For the foregoing reasons, the Secretary respectfully requests that this Court reverse the district court's decisions.

Respectfully submitted,


SEEMA NANDA
Solicitor of Labor

JENNIFER S. BRAND
Associate Solicitor

SARAH KAY MARCUS
Deputy Associate Solicitor

RACHEL GOLDBERG
Counsel for Appellate Litigation

MELISSA ANN MURPHY
Senior Attorney

/s/ Katelyn J. Poe
KATELYN J. POE
Senior Attorney
U.S. Department of Labor
Office of the Solicitor
200 Constitution Avenue, N.W.
Room N-2716
Washington, D.C.  20210
(202) 693-5304

CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(4)(G) and 32(g), I certify that the foregoing Brief for the Secretary of Labor as *Amicus Curiae* in Support of Plaintiff-Appellant:

(1)  was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font; and

(2)  complies with the length limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,498 words excluding the items listed in Federal Rule of Appellate Procedure 32(f).


/s/ Katelyn J. Poe
KATELYN J. POE

<u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing Brief for the Secretary

of Labor as *Amicus Curiae* in Support of Plaintiff-Appellant was served this 1st

day of February, 2023, via the Court's ECF system on each attorney who has

appeared in this case and is registered for electronic filing.


/s/ Katelyn J. Poe
KATELYN J. POE

# ADDENDUM A

# Oxford English Dictionary | The definitive record of the English language

# reside, *v.1*

**Pronunciation:** ? Brit.   /rɪˈzʌɪd/, U.S.   /rəˈzaɪd/,   /rɪˈzaɪd/

Forms:

α. late Middle English– **reside**, 1500s–1600s **resyde**, 1600s **recide**; *Scottish* pre-1700 **recide**, pre-1700 **resid**, pre-1700 **resyd**, pre-1700 **resyd** (past tense), pre-1700 **resyde**, pre-1700 1700s– **reside**.

β. 1500s **recede**, 1500s **resede**; *Scottish* pre-1700 **receid**, pre-1700 **resaid**, pre-1700 **resede**, pre-1700 **reseed**, pre-1700 **reseid**, pre-1700 1700s **receed**.

**Frequency (in current use):**

**Origin:** Of multiple origin . Partly a borrowing from French. Partly a borrowing from Latin. **Etymons:** French *re ider*; Latin *re idēre*.

**Etymology:** < (i) Middle French *resider* (French *résider* ) to stay, live, dwell (14th cent. or earlier), to stay in the place where one performs duties, be in residence (*a*1416), (of a quality) to be present in a person or thing (1541),

and it  etymon (ii) cla  ical Latin *re idēre* to  it, to remain in a place a  a vi itor or  ettler, (of thing ) to be or remain fixed in a po ition, to remain in exi  tence, per i  t, in po  t cla  ical Latin al  o to dwell (5th cent.), (of an official or ecclesiastic) to be in residence (6th cent.) < *re-* RE- *prefix* + *sedēre* to sit (see SEDENT *adj.*). Compare earlier RESIDENT *adj.*, RESIDENCE *n.1*, and also RESIDENT *n.1*

Compare Spanish *residir* (late 14th cent.), Portuguese *residir* (1435).

**1.**

**a.** *intransitive*. Of a thing: to lie; to be placed or stationed somewhere. *rare*.

> *a*1475   *Bk. Hawking* (Harl.   340) in *Studia Neophilol.* (1944) **16** 15 (*MED*)   For bocche  ..Kut hem with a knyf..fil the hoole full of poudere of arnement..and opon that poudere do a lytel lard reside, and so it wol away.

> 1633   T. STAFFORD *Pacata Hibernia* II. viii. 180   Her Majesties Magazines of Victualls, Munition, and Treasure re  iding there in great quantitie .

> 1725   E. FENTON in A. Pope et al. tr. Homer *Odyssey* I. I. 237   Far from your Capital my ship resides At Reithrus, and secure at anchor rides.

> *a*1771   T. GRAY *Imit. Propertiu*  in *Wk* . (1814) II. 85   Let on thi  head unfading flower  re  ide.

> 1992   *Spectator* 19 Dec. 65/3   The treasures reside today in Cairo Museum.

†**b.** *intransitive*. To remain or continue *in* a certain place or position. *Obsolete*.

> 1488  (▸ *c*1478)   HARY *Actis & Deidis Schir William Wallace* (Adv.) (1968–9) III. l. 437   In Corsby thus he resyd thaim amang Thai xvi dayis.

> 1620   T. VENNER *Via Recta* viii. 175   The third is, that they reside not in the chaire of intemperance, that is, prolong not the time in eating and drinking  uperfluou  ly.

1681  S. POURDAGE tr. P. Wait. *L'Schola Pathol. Brain* VII. 50  The e ahteell or Contraction, and extenual ; rendred them elve  by turn , and then changed place , that now the di temper re ided in one part, then presently in another.

1775  R. CHANDLER *Trav. Asia Minor* xxii. 82   In Scio it was well known the distemper had resided for some time.

**2.**

**a.** *intransitive*. Of a person holding an official position: to live in a specified place for the performance of duties; to be in residence.

c1485  (‣1456)   G. HAY *Bk. Law of Armys* (2005) 137   Jn distribucioun of wagis jn collegis, is nocht gevin bot to thame yat resydis.

c1530  in Burnet *Hi t. Ref.* I. Rec. II. xxiii. 6   You Sir Gregory being hi  Amba  adour there continually residing.

1590  in *Cal. State Papers Scotl.* (1936) X. 271   Althocht it salbe difficil to carry him [*sc.* the Bishop of Derry] levand away out of the boundis whar he resedis, yit he may be killit.

a1630  F. MORYSON in *Shakespeare's Europe* (1903) I. i. 21   The Visers or Viceroyes residing in Constantinople being 4. of old, were 7 at this tyme.

?1667  in J. Pettu  *Fodinæ Regale*  (1670) 39   One Vnder Steward to recide at the Mine .

1715  *London Gaz.* No. 5324/3   James Jefferyes, Esq., to reside for His Majesty's Service with the King of Sweden.

1776  E. GIBBON *Decline & Fall* I. p. lxvi/  (*note*)   The Roman pontiff  re ided  eventy year  at Avignon.

1813  *Times* 26 Feb. 4/1   During a whole year no Minister from Austria has resided at that Court.

1835  *Brit. Mag. & Monthly Reg.* Apr. 37   It  eem  that when, in earlier time , canon  had gone out of re idence, on returning, or re olving to re ide, they bound them elve , by fre  h oath , to re idence.

1860  *Bentley's Q.* **1** 528   A clergyman resides on his living; a cabinet-minister resides (if he does reside) in Downing Street.

190  *Time*  11 July 7/6   Sir Thoma  Barlow ha  cea ed to re ide in Buckingham Palace, but attend  there every morning in consultation with his colleagues..who are both still in residence at the Palace.

1945  *Calif. Law Rev.* **33** 621   While he became a barrister and resided in a barrister's chambers, he had but few clients and little practice.

2000  R. RUNCIE in A. Hastings et al. *Oxf. Compan. Christian Thought* 94/1   Archbishops continued to reside at Canterbury, eventually extending their rule over most of England and Wales.


**b.** *intransitive*. To dwell permanently or for a considerable time, to have one's settled or usual home *in* or *at* a particular place. Also in extended use.

1523  T. WOLSEY in *State Papers Henry VIII* (1849) VI. 115   His Grace is determyned to repaire in his oune Per on nere unto the frontier  of thi  hi  Realme towarde  Scotland, there to lye and re ide for a  ea on.

1578  T. NICHOLAS tr. F. Lopez de Gómara *Pleasant Hist. Conquest W. India* 135   Nor yet ever any hath come so neare Mexico where Mutezuma dooth reside.

1585  T. WASHINGTON tr. N. de Nicolay *Nauigation  Turkie* IV. xxxvi. 159 b   The  econd [patriarch] recedith at Caire.

a1616  W. SHAKESPEARE *Tempest* (1623) III. i. 65   The verie instant that I saw you, did My heart flie to your seruice, there resides To make me slaue to it.

1651   T. Hobbes *Leviathan* III. xlii. 290   To appoint his successour in that place, in which he last resided and dyed.

1697   J. Dryden tr. Virgil *Georgics* IV, in tr. Virgil *Wks.* 140   Secure within resides the various God, And draws a Rock upon his dark Abode.

1740   Lady M. W. Montagu *Let.* 22 Oct. (1966) II. 206   I propose to set out for Naples; I am told by every body that I shall not find it agreable to reside in.

1791   J. Boswell *Life Johnson* anno 1777 II. 160   If I were to reside in London, the exquisite zest with which I relished it in occasional visits might go off.

1816   P. B. Shelley *Alastor* 36   Where these living thoughts reside, when..my bloodless limbs shall waste I' the passing wind.

1838   E. Bulwer-Lytton *Alice* I. I. ii. 15   His father resided in the next county.

1875   J. Ruskin *Fors Clavigera* V. lviii. 279   Those of the Companions who could reside on the lands would, each on their own farm, establish [etc.].

1904   *Public Health Rep.* (U.S. Public Health & Marine-Hosp. Service) **19** 1583   The patient was a native of Hawaii who had resided in San Francisco for over three years.

1940   *Times* 17 May 8/5   Mr. F. G. J. Ford, the cricketer, for some years resided at Burwash.

1973   C. Sagan *Cosmic Connection* xiii. 88   Such a solution is liquid at the temperatures and pressures at which the Venus clouds reside.

1990   A. Steele *Clarke County, Space* 16   The mysterious source who suddenly calls on the phone, claiming to know in whose closet the skeletons reside.

2003   D. L. Scott *Wall St. Words* (ed. 3) 350   An investor residing in the United States incurs sovereign risk in purchasing a bond issued by the government of Brazil.


**c.** *intransitive.* Of an animal: to live (in a habitat, structure, region, etc.).
Cf. Resident *adj.* 1c.

> Noted by *N.E.D.* (1908) as 'Not now in serious use', but its use has persisted, mainly in technical contexts.

1640   Bp. J. Wilkins *Disc. New World & Another Planet* (new ed.) I. xiv. 226   The birds of Paradise..reside constantly in the aire.

1669   in T. J. Salmon *Borrowstounness* (1913) 84   Peatricks, dowes, plovers [etc.]..resaiding within the foirsaid bounds.

1748   B. Robins & R. Walter *Voy. round World by Anson* II. iv. 157   This place..abounds with goats... These animals reside here in great tranquillity.

1794   S. Williams *Nat. & Civil Hist. Vermont* vi. 89   The Woodchuck..resides in a hole which he digs in the ground.

1826   W. Kirby & W. Spence *Introd. Entomol.* III. xxxi. 257   The sack-like cases in which the larva resides.

1839   W. B. O. Peabody in D. H. Storer & W. B. O. Peabody *Rep. Fishes, Reptiles & Birds Mass.* 310   The Pine Warbler..is not much known, because it resides in deep, evergreen forests.

1868   J. G. Wood *Homes without Hands* xiv. 293   These are moths, belonging to the genus Acronycta, and popularly called Spurge Moths on account of the plant on which they reside.

1930   W. Herrod-Hempsall *Bee-keeping* I. vi. 315   A 'Colony' consists of the bees and queen living on combs containing brood..and food; a 'Stock' includes the latter together with the home in which the bees are residing.

1993   E. N. K. Clarkson *Invertebr. Palaeontol. & Evol.* (ed. 3) viii. 223/2   The animal resides in the last chamber (body chamber) and moves forward each time a new septum is secreted.

†**3.**

**a.** *intransitive*. To settle; to take up one's abode or station. *Obsolete. rare.*

> 1490   W. CAXTON tr. *Eneydos* xix. 70   It sholde be a shame to me..to reside in this land of lybie, wythoute to accomplishe my wyage.

> a1540   in *Bannatyne Misc.* (1855) III. 37   Thai come in Navarn and Wisbayn, and resydit on the ryver of Hyber.

> 1587   J. HOOKER *Chron. Ireland* 167/2 in *Holinshed's Chron.* (new ed.) II   The lord iustice being possessed of Asketten, he appointed a strong garrison to reside there.

> a1657   W. BURTON *Comm. Antoninus his Itinerary* (1658) 250   This Legion..was taken into Britain by Claudius Cæsar, and planted here, where..it recided against the Silures.

> c1686   R. LAW *Memorialls* (1818) 253   A man that was accessary to the death of the Archbishop of St. Andrews..came to Newbottle parish out of Fyfe, and receeded there.

**b.** *intransitive*. To rest or rely *upon* oneself. *Obsolete. rare.*

> 1610   J. HEALEY tr. St. Augustine *Citie of God* XII. vi. 445   The iust cause of the bad Angels misery, is their departure from that high essence, to reside vpon them-selues [L. *ad se ipsos conuersi sunt*].

**4.**

**a.** *transitive*. Of a quality, attribute, etc.: to be present or inherent *in* a person or thing.

> 1603   J. DAVIES *Microcosmos* 50   For three Powres speciall in the Soule reside, Reason, Concupiscence, and ardent Ire.

> a1616   W. SHAKESPEARE *Winter's Tale* (1623) I. ii. 274   Cogitation Resides not in that man, that do's not thinke.

> 1692   R. BENTLEY *Boyle Lect.* IV. 34   The meanest Plant cannot be raised without seed by any formative power residing in the Soil.

> 1720   D. WATERLAND *8 Serm. Divinity of Christ* 199   Attributes and Powers must have something to reside and inhere in.

> 1785   W. COWPER *Tirocinium* in *Task* 373   Resides such virtue in that air, As must create an appetite for pray'r?

> 1828   T. CARLYLE *Burns* in *Edinb. Rev.* Dec. 272   A man in whose heart resides some effluence of Wisdom.

> 1843   J. S. MILL *Syst. Logic* I. i. ii. §5   The meaning resides not in what they denote, but in what they connote.

> 1890   *Science* 14 Nov. 274/1   A healing virtue resides in the prussic acid.

> 1928   *Times* 22 May p. xi/3   In the case of beri-beri the absent [dietary] quality resides apparently in the husk or germ of various cereals.

> 1972   *Incorporated Linguist* **11** 30   The significance of linguistic theorizing resides..in the fact that it provides intellectual training while..introducing the learner to problems of the functioning of linguistic systems.

> 1991   S. FALUDI *Backlash* III. xi. 306   The life-preserving nature, he maintained, resided in both sexes but was unhealthily repressed in men.

**b.** *transitive*. Of power, a right, etc.: to rest or be vested *in* or *with* a person, etc.

> 1607   *Stat.* in *Hist. Wakefield Sch.* (1892) 59   That the election..alwaies reside and remayne with themselves.

*a*1674   EARL OF CLARENDON *Brief View Leviathan* (1676) 422   Let us suppose this sovereignty to reside, and be fix'd in an assembly of men.

1738   G. BERKELEY *Disc. Magistrates & Men in Authority* 16   Power—physical Power—resides in the People.

1791   T. PAINE *Rights of Man* I. 19   When despotism has established itself for ages..it is not in the person of the King only that it resides.

*a*1859   J. AUSTIN *Lect. Jurispr.* (1879) I. xii. 354   Rights are exercised by persons, or if not exercised by persons reside in persons.

1874   J. R. GREEN *Short Hist. Eng. People* i. §1. 4   The actual sovereignty within the settlement resided in the body of its freemen.

1931   *Harvard Law Rev.* **44** 750   The rights reside in the members.

1985   *Quill & Quire* Aug. 15 (*heading*)   To transform the industry from one where foreign owners are currently dominant to one where control will eventually reside with Canadians.

2006   *N.Y. Times* (National ed.) 21 July A10/2   Real power resides with the governors of the 33 provinces.

**5.** *intransitive*. To be physically present *in* a thing.

1620   T. VENNER *Via Recta* vii. 117   Corrupt humors, that reside in the body.

1657   W. COLES *Adam in Eden* xciv. 126   The lactifick vertues, which notwithstanding do reside in this herb.

1758   A. REID tr. P. J. Macquer *Elements Theory & Pract. Chym.* I. 277   He concluded that in this Saline matter resides the true Acid.

1794   G. ADAMS *Lect. Nat. & Exper. Philos.* IV. xlix. 404   If this fluid resided within bodies, in an indolent and passive state, it could exert no reluctation on any mechanical force.

1823   J. BADCOCK *Domest. Amusem.* 18   The acid which was long known to reside in wood.

1846   W. L. TIZARD *Theory & Pract. Brewing* (ed. 2) 548   The rich nectarium residing in the lupuline is prevented by the dense worts from exuding.

1901   M. FOSTER *Lect. Hist. Physiol.* 187   A fermentation set up between the combustible, sulphurous particles residing in the muscle, and the nitro-aereal spirit brought to it by the nerves.

1993   *N.Y. Times* 8 June C3/6   Influenza A is more changeable, probably because it can reside in animals, picking up new genes from animal viruses.

**6.** *intransitive*. *Computing*. Of a program, file, etc.: to be situated on a particular hard drive or computer, or in a particular memory location. Usually with *in* or *on*.

1963   *IBM Syst. Jrnl.* **2** 231   Low-order memory contains certain privileged programs and files which permanently reside in core.

1977   *Adv. in Computers* **16** 35   The routine is..usable. That is, it..resides in less than 32K including workspace, and..is relatively fast.

1990   *Managem. Computing* Nov. 52/3   It is now possible to work with data which resides on a remote server.

2008   *Age* (Melbourne) (Nexis) 4 Nov. (Computers section) 5   Spyware is software that resides on your computer and sends information back to some server about your computer contents.

This entry has been updated (OED Third Edition, March 2010; most recently modified version published online December 2022).

Copyright © 2023 Oxford University Press. All rights reserved.

# ADDENDUM B

INTERPRETATIVE BULLETIN

No. 13

# Hours Worked

Determination of Hours for Which Employees are
Entitled to Compensation Under the Fair
Labor Standards Act of 1938

November 1940



UNITED STATES DEPARTMENT OF LABOR

WAGE AND HOUR DIVISION

OFFICE OF THE ADMINISTRATOR

*Interpretative Bulletin No. 13—*

# Determination of Hours for Which Employees Are Entitled to Compensation Under the Fair Labor Standards Act of 1938

## General

1. The accurate determination of what constitutes hours worked is essential in order to establish whether the minimum wage and maximum hours requirements of sections 6 and 7 of the act have been satisfied. This bulletin is intended to indicate the course which the Administrator will follow with respect to the determination of employees' hours of work in the performance of his administrative duties under the act, unless he is directed otherwise by the authoritative rulings of the courts or unless he shall subsequently decide that his interpretation is incorrect. The manner of computing minimum wages and overtime compensation which is discussed in Interpretative Bulletin No. 4 is not within the scope of this bulletin.

2. The act contains no express guide as to the manner of computing hours of work and reasonable rules must be adopted for purposes of enforcement of the wage and hour standards. As a general rule, hours worked will include (1) all time during which an employee is required to be on duty or to be on the employer's premises or to be at a prescribed workplace, and (2) all time during which an employee is suffered or permitted to work whether or not he is required to do so. In the large majority of cases, the determination of an employee's working hours will be easily calculable under this formula and will include, in the ordinary case, all hours from the beginning of the workday to the end with the exception of periods when the employee is relieved of all duties for the purpose of eating meals.[1] The following specific problems with respect to the determination of hours worked which have been presented for our consideration are not sufficiently answered by this formula, however, and more detailed discussions of these problems are, therefore, set out in the following paragraphs.

## Time Clocks

3. Neither the statute nor Regulations, Part 516 (Requirements for Keeping Records) require that time clocks be used or specify the man-

---

[1] No opinion can be expressed at this time as to certain cases—*e. g.*, employees engaged in mining or in working under high pressure—where by custom or agreement time spent eating meals is paid for as hours worked.

First issued July 1939.
First revision (par. 15) October 1939.
Second revision (par. 15) October 1940.

2

3

236030°—40

ner in which an employer has to keep a record of the number of hours worked by his employees. Time clocks where used will be an appropriate basis for recording hours worked only when they accurately reflect the period worked by the employee. Whether or not time clocks accurately reflect the period worked by the employee is to be determined by the application of the formula in the preceding paragraph. It should be noted also that if the employer requires the employees to punch a time clock and the employee is required to be present for a considerable period of time before doing so, such time will be considered hours worked.

## Waiting Time and Employees Subject to Call

4. Many inquiries have been received with respect to periods of inactivity due to the break-down of machinery and time spent in waiting for materials to be furnished or waiting for the loading or unloading of railroad cars or other vehicles of transportation. Generally, the time during which an employee is inactive by reason of interruptions in his work beyond his control should be included in computing hours worked either if the imminence of the resumption of work requires the employee's presence at the place of employment or if the interval is too brief to be utilized effectively in the employee's own interest. This result would not be affected by the fact that the employer tells his employees that they are free to leave the premises. Hours worked are not limited to the time spent in active labor but include time given by the employee to the employer even though part of the time may be spent in idleness.

5. Many inquiries have likewise been received regarding employments, the very nature of which involve periods of inactivity for varying lengths of time. Ordinarily such periods of inactivity during which employees are on duty should be considered hours worked. Thus, for example, messenger boys who sit around in the office and wait for messages, to be routed out should be considered as working not only when they are actually delivering messages but also while waiting for such messages to be assigned. Similarly, a chauffeur who is required to drive officials of a company engaged in the production of goods for commerce should be considered as working not only when he is actually driving such officials but also during the time he is obliged to hold himself in readiness to drive. In these cases the employee engages in active work intermittently, but his time is not his own while he remains conveniently available to carry out the instructions of his employer.

6. In a few occupations periods of inactivity need not be considered as hours worked even though the employee is subject to call. The answer will generally depend upon the degree to which the

employee is free to engage in personal activities during periods of idleness when he is subject to call and the number of consecutive hours that the employee is subject to call without being required to perform active work—i. e, the frequency with which the employee is called upon to engage in work. In these cases, the nature of the employee's work involves long periods of inactivity which the employee may use for uninterrupted sleep, to conduct personal business affairs, to carry on a normal routine of living, etc. A good example of this is the employee of a small telephone exchange operating a switchboard located in the employee's house. During the night no one is in direct attendance at the switchboard and an alarm bell awakens the operator if a subscriber wishes to make a telephone call. The operator has her bed alongside the switchboard and is able to get several hours of uninterrupted sleep every night, as experience over a considerable period of time may often demonstrate. Thus, if over a period of several months a telephone operator has been called upon to answer only a few calls between the hours of 12 and 5 in the morning, a segregation of such hours from hours worked will probably be justified.

7. In some cases employees are engaged in active work for part of the day but because of the nature of the job are also required to be on call for 24 hours a day. Thus, for example, a pumper of a stripper well often resides on the premises of his employer. The pumper engages in oiling the pump each day and doing any other necessary work around the well. In the event that the pump stops (at any time during the day or night) the pumper must start it up again. Similarly, caretakers, custodians, or watchmen of lumber camps during the off season when the camp is closed, live on the premises of the employer, have a regular routine of duty but are subject to call at any time in the event of an emergency. The fact that the employee makes his home at his employer's place of business in these cases does not mean that the employee is necessarily working 24 hours a day. In the ordinary course of events the employee has a normal night's sleep, has ample time in which to eat his meals, and has a certain amount of time for relaxation and entirely private pursuits. In some cases the employee may be free to come and go during certain periods. Thus, here again the facts may justify the conclusion that the employee is not working at all times during which he is subject to call in the event of an emergency, and a reasonable computation of working hours in this situation will be accepted by the Division.

8. In some cases employees may be subject to call after the completion of their regular working day; employees may be called upon after regular working hours to furnish emergency service to cus-

tomers. If the employee is required to remain on call in or about the place of business of the company, the time spent should be considered hours worked. If, on the other hand, the employee is merely required to leave word where he can be reached in the event of a call and is not tied down to any particular place, such time need not ordinarily be considered hours worked. The employee, however, should be considered as working at any time during which he is actually making a call and his hours worked would include all time traveling to and from such a call.

## Travel Time

9. The problem of travel time, in relation to hours worked, arises in a great variety of situations and no precise mathematical formula will provide the answer in every case. The question is often one of degree; if the time spent by an employee in traveling is reasonably to be described as "all in a day's work," such time should be considered hours worked under the act.

10. As a general rule it may be stated that an employer should treat time spent by an employee during regular working hours in traveling pursuant to the employer's instructions as hours worked. If an employer requests his employee to do a job during regular working hours which requires the employee to leave the place of business, the traveling time of the employee should be included in hours worked, and this is true whether or not the particular job is within the employee's regular duties.

11. In many cases travel time outside of regular working hours is considered "part of the day's work" and, accordingly, should be treated as hours worked. Thus, an employee whose normal working day extends from 8 a. m. to 5 p. m. may be required by his employer at 5 p. m. to make one more outside call which involves 2 hours of traveling time (to get to the place where the work is to be performed and report back to the office) and active labor of 1 hour. In such case the employer may not disregard the travel time in computing the number of hours worked by the particular employee; the employee's working day would extend from 8 a. m. to 8 p. m. In this case the employee engages in active labor for his employer after the close of his regular working day and prior to the commencement of his next regular working day, and his activities between 5 p. m. and 8 p. m. are, under the circumstances, reasonably to be considered as a continuation or extension of his normal working day. The same results, of course, would be reached if the employer requested his employee to report for work 2 hours earlier in the morning in order to make the one extra call.

12. If a crew of workers is required to report for work at a designated place at a specified hour and all the employees are then driven to the place where they are to perform work, the time spent in riding to such place should be considered hours worked. Similarly, the time spent returning from the place at the close of the day's work should be considered hours worked. In some cases, however, the employer requests his employees to report for work at a specified hour at the place where the work is to be performed instead of at the employer's place of business. In these cases the employee's working time may be considered to begin at the time he reports for work, unless the traveling time required in order to reach the place where the productive work is to be performed is unreasonably disproportionate to the normal traveling time required in reporting for work at the headquarters of the employer. No precise formula will solve this type of situation. What is unreasonably disproportionate depends upon the facts in the particular case and reasonable standards agreed upon between the employer and employee will be accepted for purposes of the act.

13. In some cases an employee is required to travel continuously for more than a full working day during which time the employee is not engaged in actual productive work for his employer. For example, an employee whose regular working hours extend from 8 a. m. to 5 p. m. may be required to spend 2 or 3 days and nights of continuous travel to reach a place where he is to perform assigned work. In such case, as indicated generally in paragraph 10, time spent traveling during the regular working hours should be considered hours worked. Travel time outside of regular working hours need not ordinarily be considered hours worked. If, however, the employee is required to travel on Saturdays, Sundays, and holidays, he should be considered as working on those days for the number of traveling hours between his established starting and stopping time on other days of the week. In determining whether the foregoing is applicable, factors such as the length of time required to reach the place where the assigned work is to be performed, whether the employee is given adequate time for sleeping and relaxation, the time that the employee is required to report for actual productive labor, etc., are very important.

14. Inquiries have been received with respect to employees who are required to travel continuously for several days and who perform active labor while traveling. Thus, for example, when cattle or poultry, etc., are sent to market by rail, an employee of the shipper is required to travel on the train in order to water and feed the stock en route. In other cases an employer who ships machinery by train to a distant customer requires an employee to oil the machinery en route

and otherwise to see that it arrives in perfect condition. The employee generally rides in the caboose with the train crew. In each of the foregoing cases, the employees are subject to call for 24 hours a day, but time required for active work by such employees would ordinarily be much less. The employee generally has a substantial amount of time free for sleeping, eating, relaxation, etc.² No precise formula will decide this type of case and any reasonable agreement entered into between the parties or established by custom and usage, which takes into account the amount of time required for active labor by the employee and the fact that the employee is subject to call for 24 hours a day, will be respected by this Division in its enforcement policy.

## Meetings, Lectures, and Training Programs

### I. General

15. If the following four criteria are met, the time spent in attending meetings and lectures need not be considered hours worked: (1) Attendance on the part of the employee is in fact voluntary (attendance will not be considered voluntary if a condition of the employee's continued employment in his present job is attendance at the meeting or lecture); (2) the employee does not produce any goods or perform any other productive work during such meeting or lecture; (3) the meeting or lecture is given outside of regular working hours; and (4) the meeting or lecture is not directly related to the employee's work. (With respect to this last criterion, a meeting or lecture will not (generally be considered directly related to the employee's work unless such meeting or lecture may reasonably be considered part of his job. Obviously, attendance at a picnic or to participate in an athletic contest would not be considered directly related to the employee's work. On the other hand, meetings and lectures for the purpose of teaching the employee mine rescue or fire prevention and control do seem directly related to the employee's work.)

### II. Specific Situations

The following is a discussion of the applicability of these general criteria to specific situations:

A. *Industrial training programs.*—With respect to industrial training programs, it is our opinion that time spent in attendance at industrial training courses need not be considered hours worked if (1) attendance on the part of the employee is in fact voluntary;

²The question is obviously one of degree. No opinion is expressed in the case of the relief truck driver. (As to the exemption provided by sec. 13 (b) (1) from the hours provision of the act, see Interpretative Bulletin No. 9.)

(2) the employee does not produce any goods or perform any other productive work during such periods of training; (3) the training course is given outside of regular working hours; and (4) the training course is intended to train, the employee to a new, different, or additional skill, and is not intended to make the employee more efficient at doing what he has been doing in his present job. The last condition (4) is not a departure from the general criterion mentioned in the preceding paragraph that the meeting or lecture must not be directly related to the employee's work. Rather this condition is merely intended to indicate specifically how that criterion operates with respect to industrial training programs. In other words, in the case of industrial training programs, the programs will not be considered directly related to the employee's work if the training course trains the employee to a new, different, or additional skill.

A few examples will serve to show the distinction between those industrial training programs attendance at which will be deemed hours worked and those programs attendance at which will *not* be deemed hours worked:

(1) One example is that of a welder who is working in an automobile plant welding steel automobile frames. The employer has accepted an order for airplane fuselages, in the construction of which employees having the skill to weld aluminum will be required. The employer gives to any welder in his organization the opportunity, if he chooses, to take a course after working hours in welding aluminum. In such course no finished product is made, but the end product of the welding is scrapped. There is provision that if the welder does not acquire this higher skill he will be permitted to continue to be a welder working for the employer on steel automobile frames.

(2) Another example is that of a typist. An expansion of the plant gives opportunity for stenographers. The employer offers to any of his typists who choose an opportunity after work to be trained for stenographic work. Such training is not made a condition of their continuing as typists and no regular office work is done for the employer during the training period.

(3) Another example is the case of a punch-press operator who knows that his employer will install drop forging machines, employment in the operation of which will yield a higher rate of pay. The employer offers a certain number of punch press operators and employees in other skills an opportunity after work to be trained on drop forging machines. The end product of the forging is scrapped. Punch-press operators who do not take this course are allowed to continue in employment as punch-press operators.

10 INTERPRETATIVE BULLETIN NO. 13

(4) Finally, an example of a case in which attendance at the training course must be considered hours worked is that of a sewing-machine operator in a garment factory whose productivity is such that it is marginal in comparison with the median productivity of all the other sewing machine operators. The employer says, "You are too slow and unless you practice on waste material after work and get up your productivity and speed, you cannot work here any more." This would be hours worked for two reasons: (1) Attendance would not be voluntary, and (2) the employee would not be learning a new, additional, or different skill.

These examples point out the underlying purpose of the four conditions which must be met if attendance at the training course is not to be considered hours worked. Such purpose is to prevent exploitation of labor in violation of the act by using alleged training programs to effect a stretch-out or speed-up in the work of employees in their present position. The program to satisfy the four criteria must essentially be for the purpose of providing better employment by adding skills primarily for the benefit of the employee, although, of course, the program would also benefit the employer by providing him with certain skills in which his labor market is deficient.

B. *Attendance at public schools, recognized universities, or other bona fide institutions of learning.*—In some cases employees attend public schools or take regular courses in a recognized university or other bona fide institution of learning. The courses given are part of a standard curriculum and are not designed to accommodate the requirements of any particular plant. Thus, for example, a teller in a bank may take a university course on the financial policy of corporations, or a mechanic in a factory may take a course in draftsmanship or physics. In these cases the subject matter of the course impinges on the general subject matter of the employee's job and makes him more versatile and better qualified to assume additional responsibility. The instruction, however, has no necessary and immediate relation to the particular work done by the employee and he does not, of course, engage in any productive work for the employer during time spent taking the course. In our opinion, time spent by an employee outside regular working hours in attending lectures at, or in studying correspondence courses given by, a public school, university, or other bona fide institution of learning (even if the employer pays the necessary tuition) will not be considered "directly related to the employee's work" and, if attendance is voluntary, need not be considered hours worked.

C. *Safety meetings.*—Safety meetings which take place outside working hours and are conducted, sponsored, or otherwise approved by a governmental agency (State or Federal) or by any recognized

INTERPRETATIVE BULLETIN NO. 13 11

independent or other bona fide organization engaged primarily in disseminating safety information, will not be considered "directly related to the employee's work." Furthermore, even if the safety meeting is not so conducted, sponsored, or approved, it will not be considered "directly related to the employee's work" if it is conducted outside working hours as part of a general safety program which is not restricted to the hazards of the job at hand or to the personal responsibilities of employees in doing their job safely and efficiently. Accordingly, voluntary attendance at such meetings need not be considered hours worked.

III. Apprenticeship Training

In view of the special circumstances involved in bona fide apprenticeship training, it is our opinion that time spent in related supplemental instruction by a bona fide apprentice—one who is employed under a written apprenticeship agreement which meets the standards of the Federal Committee on Apprenticeships or which conforms substantially with such standards—need not be considered hours worked if the written apprenticeship agreement so provides. Bona fide apprenticeship programs involve considerations of public policy not present in the case of the ordinary employer-employee relationship. They are intended to provide the community with an adequate number of journeymen who have had a combination of practical experience and theoretical instruction and thus to enhance employability. The comprehensive program of practical training covering an entire trade is supplemented by theoretical instruction designed to give the apprentice a better understanding of the mechanical activities which he will be called upon to perform in his trade. It should be noted, however, that related supplemental instruction does not include time spent by an apprentice in performing his regular duties or in any active work. Such time should be considered hours worked under all circumstances.

Employees Having More Than One Job

16. Many inquiries have been received with respect to employees who work for two or more companies. Thus, for example, company A and company B may arrange to employ a common watchman, the employee having the duty of watching the property of both companies concurrently for a specified number of hours each night. In this case A and B are not each required to pay the minimum rate required under the statute for all hours worked by the watchman (i. e., 30 cents an hour each) but A and B should be considered as a joint employer for purposes of the act.

17. In some cases, however, an employee may work 40 hours for company A and 15 additional hours during the same week on a differ-

12          INTERPRETATIVE BULLETIN NO. 13

ent job for company B. In this case it would seem that if A and B are acting entirely independently of each other with respect to the employment of the particular employee, both A and B, in ascertaining their obligations under the act, would be privileged to disregard all work performed by the employee for the other company. If, on the other hand, the employment by A is not completely disassociated from the employment by B, the entire employment of the employee for both A and B should be considered as a whole for the purposes of the statute. Whether the employment by A and B are completely disassociated depends, of course, upon the facts in the particular case. This Division will scrutinize all cases involving more than one employment and, at least in the following situations, an employer will be considered as acting in the interest of another employer in relation to an employee: If the employers make an arrangement for the interchange of employees or, if one company controls, is controlled by, or is under common control with, directly or indirectly, the other company.

U.S. GOVERNMENT PRINTING OFFICE: 1940